THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRUCE JONES, Defendant-Appellant.

First District (5th Division)   No. 1—88—0214

Opinion filed June 30, 1989.

---

*Justice Freeman has listened to the tape and read the briefs in this appeal upon recusal of Justice Rizzi.

418

PINCHAM, J., dissenting.

Larry M. Evans, of Flood, Bredemann & Evans, of Park Ridge, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Jerry D. Bischoff, Mari R. Hatzenbuehler, and Thomas J. Torcasso, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant, Bruce Jones, was charged by information with possession of a controlled substance (more than 15 grams of a substance containing cocaine) with intent to deliver in violation of section 401(b)(2) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(b)(2)). He filed a motion to suppress evidence. Following a hearing, the motion was denied, and defendant was found guilty after a stipulated bench trial in the circuit court of Cook County. He was sentenced to serve a prison term of six years.

On appeal, he contends that the trial court erred in denying the suppression of evidence. The issues on appeal are: (1) whether the initial encounter between defendant and the law officers was consensual or a *Terry*-type detention; (2) if the encounter was a *Terry*-type detention, whether sufficient facts justified the detention; and (3) whether the subsequent search of defendant's shoulder bag violated his fourth amendment rights.

On March 26, 1987, defendant took a one-way flight from Midway Airport in Chicago to Fort Lauderdale, Florida. On March 29, 1987, he purchased a one-way Amtrak train ticket from Fort Lauderdale to Chicago via Washington, D.C. On March 30, 1987, Officer Christine Kolman, a 13-year veteran of the Chicago police department, learned from the Amtrak police that defendant would arrive in Chicago on Amtrak train No. 29. She also learned that day or the following day that defendant was traveling from Fort Lauderdale, Florida, via

Washington, D.C., and that he had made several similar trips in the past.

About 9:10 a.m. on March 31, 1987, defendant and a companion, Edward Borner, arrived at Union Station, 210 South Canal Street in Chicago, on Amtrak train No. 29. At that time, Kolman and other plainclothes narcotics agents were conducting a surveillance narcotics investigation. During the course of her surveillance, Kolman observed defendant and Borner exit the train. Defendant walked without hesitation through the waiting area and the rest of the train station, but he repeatedly turned around, looked behind him, and made eye contact several times with Kolman and one of the other officers. Defendant again made eye contact with Kolman once or twice as he rode up the escalator to the mezzanine level. Defendant stepped off the escalator on the mezzanine level and had walked about 5 to 10 feet away from the escalator when an Amtrak police officer approached him. This was a well-illuminated, crowded public area near the exit doors. Kolman approached defendant, identified herself as a Chicago police officer, and displayed her identification badge. The Amtrak police officer and a special narcotics agent were with Kolman and defendant, but the Amtrak police officer walked away when Kolman and the agent identified themselves. Kolman stood alongside defendant. Neither she nor the other officers touched or grabbed him, nor did they display their weapons. No one was standing in front of defendant; rather, the exit doors were in front of defendant. Defendant was not pinned against any wall or counter.

After Kolman identified herself, she asked defendant and Borner whether they would agree to speak to the officers. When they stated that they would, Kolman asked them to produce their train tickets and driver's licenses or other identification. They then produced their driver's licenses and travel itineraries. Defendant's travel itinerary reflected that he flew to Fort Lauderdale from Midway Airport in Chicago on March 26, and that he left Fort Lauderdale on March 29, on a train to Chicago via Washington, D.C. After Kolman read the documents, she returned them to defendant and Borner. She then explained that the officers were conducting a narcotics investigation, and she asked them how long they had been in Florida and whether the trip was for business or pleasure. Defendant stated that he had been on vacation in Florida since the previous Thursday and he asked Kolman what this was all about. Kolman again explained that the officers were conducting a narcotics investigation and she asked defendant and Borner whether they had illegal narcotics in their possession. Both defendant and Borner answered in the negative. Kolman then

told them in a conversational tone that they were not under arrest and that they were free to leave at any time. She asked them whether they would consent to a search of their bags and she told them that they had a right to refuse. Borner stated, "Yes, go ahead," but defendant did not answer and began to tremble. Kolman noticed that defendant was trembling and that he was very nervous and asked again whether he would consent to a search of his bags.

At this point, defendant declined to consent to a search. Kolman stated again that they were free to leave and that they were not under arrest. She explained further that she was going to detain defendant's bag temporarily in order to subject it to a canine sniff test. Defendant then stated, "You can search my bag, I've got narcotics in it but I'm carrying it for somebody else." The officers were neither touching, grabbing, threatening nor blocking defendant, nor had they drawn their weapons. Defendant did not express any desire to terminate the conversation or to leave the area. Kolman proceeded to search defendant's bag, found the contraband inside, and placed defendant under arrest. She did not arrest Borner because no contraband was found in his bags. It is undisputed that the officers had no warrant for the search or the arrest.

In denying defendant's motion to suppress, the trial court noted that the initial encounter was consensual, that the officers had a right to detain defendant's bag, and that the officers had probable cause for the search and the arrest following defendant's statement that there were narcotics in the bag.

■ A trial court's finding on a motion to suppress evidence will not be disturbed unless it is manifestly erroneous. (*People v. Long* (1983), 99 Ill. 2d 219; *People v. Reynolds* (1983), 94 Ill. 2d 160.) However, under the statute, the burden is upon defendant to prove his allegations at a suppression hearing:

> "The motion shall be in writing and state facts showing wherein the search and seizure were unlawful. The judge shall receive evidence on any issue of fact necessary to determine the motion and the burden of proving that the search and seizure were unlawful shall be on the defendant." (Ill. Rev. Stat. 1987, ch. 38, par. 114—12(b).)

In our view, defendant failed to meet his statutory burden of proof.

■ The fourth amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." (U.S. Const., amend. IV.) In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, the Supreme Court authorized a limited, investigative de-

tention short of a full arrest and short of probable cause. However, not all encounters between citizens and law enforcement officers implicate the fourth amendment. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319; *People v. Long*, 99 Ill. 2d at 229.) A seizure occurs only when a law officer restrains a citizen's liberty by physical force or show of authority. (*People v. Long*, 99 Ill. 2d at 229.) Consensual questioning does not implicate the fourth amendment. (See *Royer*, 460 U.S. at 497-98, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324; *Florida v. Rodriguez* (1984), 469 U.S. 1, 83 L. Ed. 2d 164, 105 S. Ct. 308.) According to four members of the United States Supreme Court, the fourth amendment is not violated when a law officer merely approaches a person in a public place, asks him whether he is willing to answer some questions, asks him questions if the person is willing to listen, or offers in evidence the voluntary answers to the questions. (*Royer*, 460 U.S. at 497, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324 (opinion of White, J., joined by Marshall, Powell and Stevens, JJ.); also see *People v. Long*, 99 Ill. 2d 219; *People v. Alcantara* (1989), 179 Ill. App. 3d 105.) The mere fact that the officer identifies himself as an officer, without more, does not convert the encounter into a seizure requiring some level of objective justification. (*United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.) Therefore, the threshold question in a case of this type is whether a seizure has occurred.

■ In Illinois, the test for determining whether a seizure has occurred is an objective one, namely, whether a reasonable person would have believed that he was free to leave under the circumstances. (See *People v. Miller* (1984), 124 Ill. App. 3d 620; *People v. Brett* (1984), 122 Ill. App. 3d 191.) This comports with the test set forth in *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870. There, Justice Stewart, in a portion of the opinion joined by Justice Rehnquist, stated that a seizure has occurred implicating the fourth amendment when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; see also *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.) The *Mendenhall* Court noted the following examples of circumstances that might indicate a seizure, even where there was no attempt to leave: (1) the "threatening presence of several officers"; (2) the "display of a weapon by an officer"; (3) "some physical touching of the person or the citizen"; or (4) the "use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Men-*

*denhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

■ By the same token, the test for determining whether an encounter is consensual also involves an analysis of the totality of the circumstances and is a matter which the prosecution has the burden of proving. (*Mendenhall*, 446 U.S. at 557, 64 L. Ed. 2d at 511, 100 S. Ct. at 1879.) However, the prosecution need not prove that defendant knew he could withhold his consent. *Florida v. Rodriguez* (1984), 469 U.S. 1, 83 L. Ed. 2d 165, 105 S. Ct. 308.

■ If a seizure rather than a consensual encounter has occurred, only then should attention be focused on whether the seizure was a full arrest requiring probable cause, or instead a limited investigative stop, commonly called a *Terry*-type stop. (See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Although a *Terry*-type stop does not require probable cause, it does require some adequate objective justification for the intrusion short of probable cause. (*Reid v. Georgia* (1980), 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752.) A hunch does not qualify as justification for a *Terry*-type stop. (*Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880; see also *People v. Long*, 99 Ill. 2d at 228.) Instead, justification for a *Terry*-type stop consists of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry*, 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.) Another way of stating the rule is that a *Terry*-type stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." (*Reid*, 438 U.S. at 440, 65 L. Ed. 2d at 894, 100 S. Ct. at 2754.) The facts or suspicion must be tested at the moment of the seizure or the search. (*Terry*, 396 U.S. at 21-22, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.) In evaluating the validity of a stop, the court should consider the totality of the circumstances. (*United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581.) In Illinois, the *Terry* rules have been codified in sections 107–14 and 108–1.01 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, pars. 107–14, 108–1.01). Section 107–14 provides, in relevant part:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense ***." Ill. Rev. Stat. 1987, ch. 38, par. 107–14.

According to the above principles, the threshold issue in the instant case is whether the officers' initial encounter with defendant

constituted a seizure. If it was not a seizure, then it is unnecessary to determine whether it was justified by sufficient, articulable facts or by a reasonable suspicion. In our view, the circumstances of defendant's initial encounter with the officers indicate that the encounter was consensual. He agreed to speak to the officers. They neither cornered him nor otherwise prevented his departure through physical contact, language, or tone of voice, nor did they threaten him physically or verbally or display any weapons. They did not block his way and he could have exited the train station through the doors directly in front of him. They did not retain his driver's license or his travel itinerary. To the contrary, Kolman immediately returned defendant's driver's license and travel itinerary. If the retention of his driver's license would have tended to negate his freedom to leave (see *Royer*, 460 U.S. at 501, 75 L. Ed. 2d at 239, 103 S. Ct. at 1326; *People v. Hardy* (1986), 142 Ill. App. 3d 108), then immediate return of the driver's license to defendant should have had the opposite effect—it should have communicated to defendant that the officers were satisfied with his identification (*People v. Brett* (1984), 122 Ill. App. 3d 191), and that defendant was free to leave if he chose to do so. (See *People v. Claver* (1987), 162 Ill. App. 3d 62.) Indeed, Kolman specifically informed defendant that he was free to leave at any time. Furthermore, she specifically informed him that he did not have to consent to a search. This statement is also consistent with the conclusion that defendant was free to leave. *People v. Miller* (1984), 124 Ill. App. 3d 620.

■ We believe that a reasonable person in defendant's position would have considered that he was free to leave. If defendant believed that he was not free to leave, then his belief was unreasonable. (*People v. Brett*, 122 Ill. App. 3d at 196.) In our opinion, the State met its burden under *United States v. Mendenhall* of proving that defendant's consent was freely and voluntarily given. Although the State did not have to show that defendant subjectively knew he could refuse to consent (*Florida v. Rodriguez* (1984), 469 U.S. 1, 83 L. Ed. 2d 165, 105 S. Ct. 308), the record discloses that defendant was specifically advised that he was free to leave and that he could refuse to consent. It was only after defendant started to tremble and did not respond to Kolman's statement that defendant was told his bag would be detained. We conclude that defendant failed to meet his statutory burden of proving the allegations in his motion to suppress and that he was not seized within the meaning of the fourth amendment. Ill. Rev. Stat. 1987, ch. 38, par. 114—12(b).

■ To summarize, the manifest weight of the evidence discloses

that the encounter between defendant and the narcotics agents was consensual rather than a seizure within the meaning of the fourth amendment. Therefore, the trial court's denial of defendant's motion to suppress was not against the manifest weight of the evidence, and the encounter did not taint the search of defendant's shoulder bag and did not warrant suppression of the cocaine found therein or of defendant's statement.

██ █ Furthermore, the search of defendant's shoulder bag did not violate his protected fourth amendment interest in retaining possession of his personal effects and property. *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, allows this interest to be overcome and authorizes a limited intrusion if the law officers have reason to suspect that the luggage contains narcotics. Under *United States v. Place*, probable cause is not a prerequisite for the seizure of luggage; instead, luggage can be seized based upon a reasonable suspicion that it contains narcotics. (462 U.S. at 702, 77 L. Ed. 2d at 117, 103 S. Ct. at 2642.) In the instant case, the manifest weight of the evidence indicates that Kolman reasonably suspected that defendant's shoulder bag contained narcotics. Moreover, Kolman had probable cause to search the bag and to arrest defendant when defendant volunteered that the bag contained narcotics. We hold that the search of the shoulder bag was neither tainted by the preceding events nor independently amounted to a separate violation of the fourth amendment.

Our conclusions are consistent with the following cases cited in defendant's brief. For example, we recently noted that *People v. De-Lisle* (1982), 104 Ill. App. 3d 297, follows an outdated analysis and essentially has been overruled. (See *People v. Forrest* (1988), 172 Ill. App. 3d 385.) In *People v. Kiser* (1983), 113 Ill. App. 3d 501, the agents physically blocked defendant's exit onto an escalator. Considering the reasonable and articulable factor used by the Court in *Reid v. Georgia* (1980), 448 U.S. 438, 65 L. Ed. 2d 890, 100 S. Ct. 2752, to determine whether an investigatory stop is justified, we must conclude that the encounter in the instant case was consensual, and not an investigatory stop.

Judgment affirmed.

COCCIA, J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent. The police tactics in the case at bar and their approval

by the trial court and this court promote and advance the despicable oppressions known to exist in totalitarian police states in which cherished civil liberties are enjoyed by only the privileged and powerful few.

I

"CAN IT HAPPEN HERE?"

On Thursday, June 29, 1989, at page A4 the following (excerpted) article appeared in the New York Times:

"IN NIGERIA, TO ROT IN JAIL IS A HAZARD OF THE INNOCENT:

LAGOS, Nigeria—a 26-year-old man with no criminal record is picked up by the police while driving near his home. He is not allowed to contact anyone, even his wife, whom he married the day before. He spends the next 8 years in jail, without trial.

That was the experience of Joseph Odogu, who was accused of armed robbery in the summer of 1980. Inexplicably, month after month, his trial date was postponed. And because he was arrested under a special decree enacted by Nigeria's military Government, he could not be free on bail.

'It was a horrid, horrendous, dehumanizing situation,' said Olisa Agbakoba, Mr. Odogu's lawyer and chairman of the Lagos-based Civil Liberties Organization. 'And while he wasted in jail, his car was stolen, his shop ransacked, his landlord chucked him out, his mother died and his wife deserted him.'

What Mr. Agbakoba soon discovered after taking on Mr. Odogu's case last year was that his client had fallen through the cracks of Nigeria's often harsh and byzantine legal system. Prosecutors, in fact, decided within months of Mr. Odogu's arrest that he was the wrong man. But no one bothered to tell him, his jailers or the courts.

\* \* \*

Mr. Odogu's case may seem especially cruel, but Mr. Agbakoba says it is only one of hundreds of such accounts of desperation in various police cells and detention centers across Nigeria.

Since it was formed two years ago, the Civil Liberties Organization has documented a continuous stream of cases illustrating shortcomings in Nigeria's judicial and law enforcement systems.

Sometimes, as in Mr. Odogu's case, the problems are caused by sloppy police work, albeit on a grand scale.

Increasingly, however, the group has uncovered alarming evidence of widespread human rights violations. In the first six months of 1988, for example, the group disclosed that 54 detainees in a single federal prison here died while awaiting trial; that the Government does not dispute.

In another instance, the group recently brought a class-action lawsuit challenging the incarceration of 70 prisoners who had been detained without trial for periods of 3 to 10 years. So far, 20 have been released." N.Y. Times, June 29, 1989, at A4.

No rational person is so bold as to suggest that even remotely similar situations presently occur in our State or in our nation. But is any rational person so bold as to suggest that "It can't happen here"? History is replete with fallen democracies and free societies which believed and smugly preached, "It can't happen here." To paraphrase George Santayana, if we fail to remember our mistakes we are condemned to repeat them.[1]

History teaches, if only we will learn it, that no free society was ever totalitarianized from within, suddenly, and without warning. The true danger to constitutional freedom is the *gradual*, but unrelenting erosion of constitutional guarantees, perpetuated in the name of self-serving euphemistic phrases such as "LAW AND ORDER." History also fervently teaches that the danger of an encroaching police state is most perilous when the citizens are most complacent. I wholeheartedly agree with that great patriot and libertarian, Benjamin Franklin, who eloquently prophesied that those who would willingly forfeit a little of their freedom for a little more security will end up with neither.[2]

I also endorse Adlai Stevenson's sage advice: "Carelessness about our security is dangerous; carelessness about our freedom is also dangerous." The plain and simple truth is we have become and are becoming increasingly careless about our precious freedoms, and the majority opinion is but another example of it. *Boyd v. United States* (1886), 116 U.S. 616, 29 L. Ed. 746, 6 S. Ct. 524, is now older than a full century. But its teachings are, if anything, more vibrantly

---

[1] The actual quotation is: "Those who cannot remember the past are condemned to repeat it."

[2] "They that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety." Historical Review of Pennsylvania, 1759.

relevant today than when they were written:

> "[I]llegitimate and unconstitutional practices get their first footing in that way, namely: by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. *It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.*" (Emphasis added.) 116 U.S. at 635, 29 L. Ed. at 752, 6 S. Ct. at 535.

All this comes down to a simple question, but one well worth contemplating: If the courts refuse to and will not protect and enforce the constitutional guarantees of our citizens, then who will? If on one day a court permits the search of a passenger because he is first off a plane, bus or train, or is "nervous," is it not "logical" or "consistent," or, indeed *"stare decisis"* for a court on the next day to sanction the search of a passenger because he disembarked last or "calmly"? This is not at all farfetched, as Justice Marshall observed in his dissent in *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581. There, Justice Marshall made note of the so-called DEA "profile" and its multiple, "chameleon-like way of adapting to any particular set of circumstances." He then listed the following authorities as illustrative of those judicially approved flexible adjustments:

> "Compare, *e.g., United States v. Moore*, 675 F.2d 802, 803 (suspect was first to deplane), with *United States v. Mendenhall*, 446 U.S. 544, 564 (last to deplane), with *United States v. Buenaventura-Ariza*, 615 F.2d 29, 31 (deplaned from middle); *United States v. Sullivan*, 625 F.2d 9, 12 (one-way tickets), with *United States v. Craemer*, 555 F.2d 594, 595 (round-trip tickets), with *United States v. McCaleb*, 552 F.2d 717, 720 (non-stop flight), with *United States v. Sokolow*, 808 F.2d 1366 (changed planes); *Craemer*, supra, at 595 (no luggage), with *United States v. Sanford*, 658 F.2d 342, 343 (gym bag), with *Sullivan*, supra, at 12 (new suitcases); *United States v. Smith*, 574 F.2d 882 (traveling alone), with *United States v. Fry*, 622 F.2d 1218, 1219 (traveling with companion); *United States v. Andrews*, 600 F.2d 563, 566 (acted nervously), with *United States v. Himmelwright*, 551 F.2d 991, 992 (acted too

calmly)." 490 U.S. at 13-14, 104 L. Ed. 2d at 14-15, 109 S. Ct. at 1588-89 (Marshall, J., dissenting).

If today the court relaxes the probable cause standards for disembarking passengers from public vehicular transportation, shall not the court tomorrow do the same on identical rationale to embarking ones? If the Constitution permits indiscriminate searches of persons traveling on interstate planes and trains why not buses,[3] and autos, motorcycles and even bicycles or roller skates? Why, logically, limit such searches to *interstate* travelers? Surely if the State and Federal constitutional prohibitions against unreasonable search and seizure permit seizures of interstate travelers and their "effects" on such flimsy and perhaps fabricated grounds as "eye contact," or the lack of it, or "the order of disembarkation," or the degree of "nervousness" or "calmness," or the amount of luggage or type of it or lack of it, they then also permit identical searches and seizures of intracity travelers on buses, subways, taxis and even in private conveyances. Inevitably Americans will become completely insecure on their public streets from police state tactics and they will be secure *from* the police only while in their own homes, and then (?)...Surely, this is to burn down the house to roast the pig.

Even so, we might debate whether sacred constitutional guarantees should or must yield in order to stamp out what is unquestionably one of the worst man-made plagues ever·inflicted upon any people, that of nefarious narcotic usage and trafficking. I say we might debate this matter *if* history, or even some unreliable statistics, demonstrated that as the rights of personal security and privacy have lessened, the problems of illegal drugs have also somewhat lessened in any related, or even unrelated, proportion. Unfortunately, the proportion simply has been inverse. This is no accident.

For the nearly 40 years that I have been intimately and inextricably involved in the Federal and States' criminal justice systems throughout America, I have listened to and observed firsthand law enforcement personnel and "strict constructionists" advocate one "remedy" after another as being "just the needed tool," necessary to enable the police to rid society of the scourge of drugs. "Unhandcuff the police," so they can do what needs to be done, we have been urged over and over again. I characterize these requests as a police "if only" or "wish list" philosophy. "If only," we have been repeatedly told, the police had this or that wish granted they could solve

---

[3]See, *e.g., United States v. Winston* (D.C. Cir. 1989), 711 F. Supp. 639, involving a *Terry*-type stop of a bus passenger traveling from New York to Washington, D.C.

the crime and drug problems. For instance, "if only" the police could utilize hearsay warrants,[4] or hearsay arrests,[5] or "stop and frisk,"[6] or "good faith" searches,[7] or "inevitable discovery" seizures[8] or "totality of circumstances" search warrants,[9] or search warrants and warrantless arrests based on secret informers.[10] We were first told that warrantless "consensual" overhears were vital to the police,[11] then pen registers,[12] and finally wiretapping and eavesdropping devices.[13] The police have pressed for warrantless aerial surveillance of our citizens while in their homes and businesses,[14] as well as the right to conduct warrantless searches of their cars,[15] and personal packages, bags, luggage,[16] and even their trash.[17] Law enforcement has successfully proffered evidence procured as the result of physical trespass on private property,[18] and even as the result of the commission of the criminal offense of burglary by the law enforcement agents themselves.[19] On some occasions the police have sought approval for entries into private premises before obtaining a search warrant,[20] and sometimes without even bothering to obtain a search warrant at all.[21] Even alimentary canals are not protected from the prying eyes of Big Brother.[22]

---

[4]Granted in *Jones v. United States* (1958), 357 U.S. 493, 2 L. Ed. 2d 1514, 78 S. Ct. 1253.

[5]Granted in *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329.

[6]Granted in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.

[7]Granted in *United States v. Leon* (1984), 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405.

[8]Granted in *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.

[9]Granted in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.

[10]Granted in *Rugendorf v. United States* (1964), 376 U.S. 528, 11 L. Ed. 2d 887, 84 S. Ct. 825; *McCray v. Illinois* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056.

[11]Granted in *United States v. White* (1971), 401 U.S. 745, 28 L. Ed. 2d 453, 91 S. Ct. 1122.

[12]Granted in *United States v. New York Telephone Co.* (1977), 434 U.S. 159, 54 L. Ed. 2d 376, 98 S. Ct. 364.

[13]Granted in 18 U.S.C. §§2510 through 2520 (1988); Ill. Rev. Stat. 1987, ch. 38, par. 108A—1 *et seq.*

[14]Granted in *California v. Ciraolo* (1986), 476 U.S. 202, 90 L. Ed. 2d 210, 106 S. Ct. 1809; *Dow Chemical Co. v. United States* (1986), 476 U.S. 227, 90 L. Ed. 2d 226, 106 S. Ct. 1819; *Florida v. Riley* (1989), 488 U.S. 445, 102 L. Ed. 2d 835, 109 S. Ct. 693.

[15]Granted in *United States v. Ross* (1982), 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157.

When I consider the insatiable and voracious appetite of the law enforcement community for devouring precious constitutional freedoms and the increasing yielding to that hunger, I recall almost immediately the ancient nursery rhyme of the Walrus and the Oysters:

" 'O Oysters, come and walk with us!'
The Walrus did beseech.
'A pleasant walk, a pleasant talk,
Along the briny beach.'
'But wait a bit,' the Oyster cried,
'Before we have our chat;
For some of us are out of breath,
And all of us are fat!'
'I weep for you,' the Walrus said:
'I deeply sympathize.'
With sobs and tears he sorted out
Those of the largest size,
Holding his pocket-handkerchief
Before his streaming eyes.
But answer came there none—
And this was scarcely odd;
THEY'D EATEN EVERY ONE.''

There is no question, and my 40 years of experience have demonstrated to me, that many of these invasions and intrusions into personal privacy and property are accompanied by violence and threats of violence to the citizen, although, of course, rarely if ever in those

---

[16]Granted in, *e.g.*, *New York v. Belton* (1981), 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860; *Illinois v. Lafayette* (1983), 462 U.S. 640, 77 L. Ed. 2d 65, 103 S. Ct. 2605; *Illinois v. Andreas* (1983), 463 U.S. 765, 77 L. Ed. 2d 1003, 103 S. Ct. 3319; *United States v. Johns* (1985), 469 U.S. 478, 83 L. Ed. 2d 890, 105 S. Ct. 881; *Colorado v. Bertine* (1987), 479 U.S. 367, 93 L. Ed. 2d 739, 107 S. Ct. 738.

[17]Granted in *California v. Greenwood* (1988), 486 U.S. 35, 100 L. Ed. 2d 30, 108 S. Ct. 1625.

[18]Granted in *Oliver v. United States* (1984), 466 U.S. 170, 80 L. Ed. 2d 214, 104 S. Ct. 1735; *United States v. Dunn* (1987), 480 U.S. 294, 94 L. Ed. 2d 326, 107 S. Ct. 1134.

[19]Granted in *United States v. Payner* (1980), 447 U.S. 727, 65 L. Ed. 2d 468, 100 S. Ct. 2439.

[20]Granted in *Segura v. United States* (1984), 468 U.S. 796, 82 L. Ed. 2d 599, 104 S. Ct. 3380; *Murray v. United States* (1988), 487 U.S. 533, 101 L. Ed. 2d 472, 108 S. Ct. 2529.

[21]Granted in *Griffin v. Wisconsin* (1987), 483 U.S. 868, 97 L. Ed. 2d 709, 107 S. Ct. 3164.

[22]Granted in *United States v. Montoya de Hernandez* (1985), 473 U.S. 531, 87 L. Ed. 2d 381, 105 S. Ct. 3304.

cases *sub judice.* And despite all this and much much more,[23] the law enforcement community and their judicial and other apologists and advocates often wonder or pretend to wonder aloud why it is that ever enlarging segments of society have declining respect for the police. Justice Jackson, a former Attorney General of the United States, gave us the answer many years ago when he wrote:

"Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

But *the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court.*" (Emphasis added.) *Brinegar v. United States* (1949), 338 U.S. 160, 180-81, 93 L. Ed. 2d 1879, 1893, 69 S. Ct. 1302, 1313 (Jackson, J., dissenting).

It is beyond dispute that as the police "wish list" has grown and has been granted, and as each provision of our sacred Bill of Rights has been pressed into an unrecognizable depletion, the monstrous drug plague has become more—not less—acute. And I think it is not serendipitous; not only predictable but inevitable that as the constitutional guarantees of the American people have been diminished, the crime problem has expanded and accelerated. After all, at bottom, crime and particularly drug trafficking evince a disrespect for the law and the worth of the individual. There is no gainsaying that many people simply will not comply with a law unless they respect those who enforce it. Sagacious Justice Brandeis in *Olmstead v. United States* (1928), 277 U.S. 438, 72 L. Ed. 2d 944, 48 S. Ct. 564, where, speaking of wiretapping, wisely said:

"Will this Court by sustaining the judgment below sanction such conduct on the part of the Executive? The governing

---

[23]*E.g.,* "use" immunity, *Kastigar v. United States* (1972), 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653; warrantless searches of bank records, *United States v. Miller* (1976), 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619; forfeiture of attorney fees and other property, *United States v. Monsanto* (1989), 491 U.S. 600, 105 L. Ed. 2d 512, 109 S. Ct. 2657; tougher sentencing laws, *Mistreetta v. United States* (1989), 488 U.S. 361, 102 L. Ed. 2d 714, 109 S. Ct. 647; denial of pretrial bail, *United States v. Salerno* (1987), 481 U.S. 739, 95 L. Ed. 2d 697, 107 S. Ct. 2095; etc., etc.

principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands. The maxim of unclean hands comes from courts of equity. But the principle prevails also in courts of law. Its common application is in civil actions between private parties. Where the Government is the actor, the reasons for applying it are even more persuasive. Where the remedies invoked are those of the criminal law, the reasons are compelling.

The door of a court is not barred because the plaintiff has committed a crime. The confirmed criminal is as much entitled to redress as his most virtuous fellow citizen; no record of crime, however long, makes one an outlaw. The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. The rule is one, not of action, but of inaction. It is sometimes spoken of as a rule of substantive law. But it extends to matters of procedure as well. A defense may be waived. It is waived when not pleaded. But the objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the litigation. The court protects itself.

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. *Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a law-breaker, it breeds contempt for laws; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face.*" (Emphasis added.) 277 U.S. at 483-85, 72 L. Ed. 2d at 959-60, 48 S. Ct. at 574-75 (Brandeis, J., dissenting).

One need not be astutely perceptive to recognize that every time

a person is *unjustifiably* harassed and ill-treated by a policeman, that person becomes to a like degree, and at the very least *sub silentio*, an implacable foe of law enforcement and thereby also a foe of organized society. The principle that for every action there is an equal and opposite reaction applies not alone to the physics lab. We must always recall, as Justice Jackson aptly pointed out in *Brinegar*, the courts only hear about the travelers who had illegal drugs; the instances in which the search was fruitful; the wiretapped conversations that revealed criminality. How many travelers are searched, how many invasions of privacy occur in which no arrests are made, no contraband discovered, and about which the courts never hear? Yet the invasions of privacy of these law-abiding citizens are at least as acute and their degree of disgruntlement undoubtedly more intense than in those incidences where contraband is discovered. Judge John Grady of the United States District Court in Chicago and a former assistant United States Attorney put it this way:

"The cases which come to court are the ones in which the police-citizen encounter has yielded incriminating evidence. We hear nothing of any encounters where the police are wrong in their suspicions. We hear nothing about instances where the dogs sniffed luggage and did not 'alert positively' for the presence of drugs. The cases in which the police play a mere hunch, which is essentially what they claimed to have done here, and find nothing as a result of the encounter or the search are cases we never see and whose number would be mere speculation. That they exist, however, seems certain, unless one were to indulge the presumption that the police are infallible in their suspicions.

When the police are told that there is a whole area known as 'the non-coercive police-citizen encounter' in which they are free to operate, the possibility of abuse is apparent. Because the question of abuse will arise only in cases where a prosecution ensues, or in the rare case where an aggrieved person might file a civil suit for false arrest, the legal environment experienced by police officers is not one that compels or even necessarily encourages circumspection in their contacts with citizens. One danger is that the police will conduct *Terry*-type stops where the facts did not justify it, realizing that they will rarely be called into account in situations where 'no harm is done.' If such an attitude exists, it is a short step from there to rationalization of the unjustified stops which pay off in the recovery of contraband. \*\*\* For instance, looking at the mat-

ter in retrospect, wasn't the suspect really looking around quite cautiously as he entered the concourse? Didn't he look back over his shoulder a few times? *In the alternative, it would not be too difficult to overlook any threatening aspect of the encounter, so as to justify the argument that the interview was entirely consensual.*" (Emphasis added.) *United States v. Freymuller* (N.D. Ill. 1983), 571 F. Supp. 61, 67.

As Judge Grady pointed out, it is not unknown for the policemen to misrepresent the facts or "color" their testimony. For example, in one of the cases relied upon by the majority herein, *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616, the officer involved, Chicago police officer Boyle, was the same Officer Boyle who testified in *Freymuller*, and whose testimony Judge Grady specifically and unequivocally disbelieved. Beyond that, Officer Boyle and his partner, Officer Richard Crowley, are the same police officers who recently testified that they observed a defendant deplane at Chicago's Midway Airport carrying luggage when, in fact, the undisputable airline personnel testimony and computer printouts, as well as the defendant's own testimony, indisputably showed that *he was not even on the plane at all*, resulting in United States District Judge James Moran sustaining the defendant's motion to suppress in *United States v. John Bonds.*[24]

I do not intend to convey even a shadow of an impression that egregious privacy, property and other personal invasions occur only in drug cases. Recently it has been disclosed that Federal judges in such American cities as Cincinnati and Miami had their telephones "bugged."[25] The Chicago Tribune revealed (June 13, 1989, at 1.) under its lead headline "F.B.I. CAMERA FOUND AT POLITICIANS' HANGOUT," that the FBI placed audio-video recording equipment in a very popular Chicago Loop restaurant.[26] Furthermore, according to the article, the United States Attorney conceded that the proprietors

---

[24]Chicago Lawyer, April 18, 1989, Vol. 12, No. 4, at 1.

[25]It was recently revealed that FBI documents "showed that the Bureau had wiretapped or monitored conversations involving former Chief Justice Earl Warren and at least three other members of the [Supreme] Court." N.Y. Times, August 29, 1989, section 1, at 7.

[26]Admittedly this is nothing new. On Friday, October 13, 1989, the Chicago Tribune reported, section 1, at 18, that a settlement between the FBI and the National Lawyers Guild in New York had been reached in which as part of the settlement the FBI *conceded* that it had spied on members of the Guild between 1940 and 1975, repeatedly broke into Guild Headquarters, tapped Guild phones, sifted through Guild garbage cans and those at individual members' law offices, and engaged in "disruptive" operations against the Guild.

of the restaurant were not the subject of any investigation and that the camera and microphone recorded *everyone's* conversations within their range.

Big Brother has even snooped on librarians and library patrons. "Documents Disclose F.B.I. Investigation of Some Librarians," an article by David Johnson, reported at pages A1 and B9 of the Thursday, November 7, 1989, edition of the New York Times, states the following:

> "F.B.I. agents interviewed librarians at institutions, primarily in the New York area, and asked the librarians to report contacts with people who identified themselves as Soviet-bloc nationals or as people assigned to Soviet-bloc organizations.
>
> New documents show that *librarians and others with whom the F.B.I. made contact during the surveillance program were themselves subjected to bureau scrutiny.* After a number of librarians criticized the surveillance program, the bureau conducted inquiries to determine whether they were being influenced by a Soviet-backed effort to discredit the program.
>
> \* \* \*
>
> 'The F.B.I. never understood why people were upset with the Library Awareness Program,' said Representative Don Edwards, Democrat of California, who is chairman of the House Judiciary Subcommittee on Civil and Constitutional Rights. The panel held hearings on the program last year.
>
> *'The F.B.I. never understood that the librarians and other Americans think that libraries are sacred,'* said Mr. Edwards. 'It's very dismaying that the F.B.I. so failed to understand what was the source of this criticism.'
>
> \* \* \*
>
> The names fed into the F.B.I.'s system of files included a number of librarians and representatives of library-affiliated groups who had publicly criticized the program, Archive officials said.
>
> Tom Blanton, deputy director of the Archive, said the group determined from an analysis of the bureau's search that more than 100 of the 266 people were either librarians or people affiliated with library organizations.
>
> \* \* \*
>
> A September 1987 memo to the F.B.I. concerned an interview conducted at the Brooklyn public library. The memo complained that library employees resisted the bureau's surveillance effort. 'This attitude has increasingly been encountered,'

the memo said, adding, 'and it should not remain unchallenged.'

\* \* \*

Many librarians were highly critical of the surveillance program because it sought to use library circulation records, which list the users of library information, as a part of the investigation. *'We consider circulation records to be private,'* said Judith F. Krug, director of the office of intellectual freedom for the American Library Association. *'It's nobody's business what you read but yours.'* " (Emphasis added.) N.Y. Times, November 7, 1989, at A1, B9.

I question whether American citizens born, baptized, bred and reared in the firm belief and conviction that they have been guaranteed life, liberty and freedom from unwarranted government intrusion are really desirous or willing to reveal their most intimate private actions and conversations, all of which are perfectly legal, in order that the government *might possibly* or *hopefully* procure some tidbits of information about an unspecified subject. Yet this invariably occurs when police are permitted to indiscriminately inspect and sift through the luggage of innocent travelers until they find contraband, or audio-video record, who knows how many conversations of restaurant dining guests until the police *may* hear and record something incriminating from someone. Are the American people really willing to have their homes surveilled by helicopter, their luggage examined by police or sniffed by pointing police dogs, their private and personal conversations, while breaking bread, repasting and imbibing with friends, recorded by government? I think not! Are not and should not American citizens be free from their government sneaking, prowling and prying into their library visits, their librarians and their sacred freedom to read whatever they choose? Yes, most assuredly yes!

### "CAN IT HAPPEN HERE?"

My answer is, it most assuredly cannot happen here, if, but only if, we remain true to our heritage and our constitutional principles. Over 200 years ago the Founding Fathers of this great nation made some monumental decisions and "balanced" some momentous conflicting rights, principles, guarantees and obligations. Among those rights which the Fathers intended to protect was the right of an American citizen to be secure in his person and in his house, and in his effects against unreasonable search and seizure. The fourth amendment to the Constitution of the United States, fully binding

upon the States by the due process clause of the fourteenth amendment (*Mapp v. Ohio* (1961), 367 U.S. 643, 646 n.4, 6 L. Ed. 2d 1081, 1085 n.4, 81 S. Ct. 684, 1689 n.4) provides:

> "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV.

Article I, section 6, of the Constitution of the State of Illinois similarly provides.

To insure that this and every other right and guarantee in the Constitution not be abridged, whittled away, watered down or nullified, the Founding Fathers required that every judge, from the most exalted to the petty, State as well as Federal, take an oath to support the Constitution. When the people of Cook County elected me to fill my present office I took that very oath prescribed by the Founding Fathers in article VI, clause 3, of the Constitution. I regard that oath as profound and sacred as anything I have ever done. That oath demands that I adamantly defend, protect, support, uphold and enforce, not dilute and convolute constitutional privileges and guarantees. I will not violate that solemn oath because of any perceived convenient "swings" in judicial philosophy[27] or because this is a "narcotic case," or for the dubious distinction of being a foot soldier in the President's "War on Drugs," to be compatible or popular or for any other temporal and transitory reason. To paraphrase the playwrite Lillian Hellman, I will not cut the Constitution or my conscience to fit this year's fashions. With all due respect for many of my brethren on this court, as well as on many other courts in this State and nation, we are reaching the point where it can be (and already is being) said with more than a modicum of truth that even more deleteriously and adversely affected by drugs than the addict are the judicial decisions stretching and perverting fundamental constitutional freedoms and principles in order to obtain and sustain criminal drug convictions.

Like Clarence Darrow, I fervently believe it is essential that strong men and women be ever vigilant in the never-ending pursuit of freedom. Defending one of his most famous cases, Darrow once said:

---

[27]See *Consensus Builder Rehnquist Emerges As A Skillful Leader Of The Court's Majority*, Wall Street Journal, June 29, 1989, at 1; *The Year the Court Turned Right*, N.Y. Times, July 7, 1989, at 1.

"I know that the nation that is not watchful of its liberty will lose it. I know that the individual that will not stand for his rights will have no rights, and I believe the first duty of every American citizen is to protect himself and his country in all the liberties we have and all that we can get.

You can only protect your liberties in this world by protecting the other man's freedom. You can only be free if I am free. The same thing that would get me may be used to get you, and the government that is not strong enough to protect all its citizens ought not to live upon the face of this earth." I. Stone, Clarence Darrow for the Defense (1941).

I also applaud Chief Judge Wald's opening lines in his dissenting opinion in *United States v. Bonner* (D.C. Cir. 1989), 874 F.2d 822, 830:

"As citizens, we owe wholehearted support to law enforcement officials on the front lines in the war against illegal drugs. *As judges, our duty is to ensure that our laws continue to govern the conduct of our law enforcement officials.* Otherwise we are at risk of losing an even more important battle— the battle to remain a law abiding society, in the face of law violators as destructive as drug dealers." (Emphasis added.)

Judge Ferguson's words in his dissenting opinion in *United States v. Salas* (9th Cir. 1989), 879 F.2d 530, are equally compelling:

"Invoking the metaphors and images of battle the government's 'war on drugs' has already made casualties of constitutional protections and personal dignity. See *National Treasury Employees Union v. Von Raab* (1989), 489 U.S. 656, 686, [103 L. Ed. 2d 685, 715,] 109 S. Ct. 1384, 1401 (Scalia, J., dissenting). *However laudable the underlying goal of eradicating drugs from our society, we must ensure that we do not eradicate the Fourth Amendment in the process of serving that goal*—worthy aims alone do not create reasonable searches." (Emphasis added.) 879 F.2d at 541.

Like Judge Poole, I long for the past, lament the present, and fear for the approaching frenzied future:

"There was a time in the history of this country when judges—and especially judges of the United States courts—understood and were anxious to honor the epochal history out of which developed jealous strictures on the issuance of search warrants. There was a time, too, when judges did not feel the urge to weaken those dearly bought protections to which every citizen is entitled as against abuse by the government ***."

*United States v. Luk* (9th Cir. 1988), 859 F.2d 667, 678 (Poole, J., dissenting).

In these waning years of the 20th century we are going to have to face some hard questions, the most difficult of which is what kind of a country are we going to leave to our children and to our children's children. Do we really want to leave them a nation dominated by constant pervasive police surveillance? A country where home and office phones are wiretapped and surveilled almost as a matter of course? A country where a citizen cannot travel without being accosted by petty officers seeking to seize and search? There are those who dislike the exclusionary rule because in many instances it results in the suppression of probative incriminating evidence. We all recognize this. The question, however, is not whether we like it but whether there exists a viable alternative. Unfortunately, the only "alternative" is to entrust our precious liberties to the tender mercies of the police, and I, for one, am not going to agree to that. No cancer patient "likes" chemotherapy or radiation treatments, but the alternative is far less desirable.

### "CAN IT HAPPEN HERE?"

Justice Thurgood Marshall has given the answer:

"[S]ometimes we must pay substantial social costs as a result of our commitment to the values we espouse. But at the end of the day the presumption of innocence protects the innocent; the shortcuts we take with those whom we believe to be guilty injure only those wrongfully accused and, ultimately, ourselves.

\*\*\* Our Constitution, whose construction began two centuries ago, can shelter us forever from the evils of such unchecked power. Over 200 years it has slowly, through our efforts, grown more durable, more expansive, and more just. But it cannot protect us if we lack the courage, and the self-restraint, to protect ourselves." *United States v. Salerno* (1987), 481 U.S. 739, 767, 95 L. Ed. 2d 697, 721, 107 S. Ct. 2095, 2112 (Marshall, J., dissenting).

It is with these thoughts that I turn to the case at bar.

### II

The defendant, Bruce Jones, was charged in an information with possession on March 31, 1987, with intent to deliver more than 15 grams of a substance containing cocaine. Prior to trial the defendant made a motion to quash arrest and to suppress evidence. Only one witness, Christine Kolman, called by the defendant, testified on the

evidentiary hearing of the motion and her complete testimony is as follows.

Direct Examination:

"My star number is 17864 and I am assigned to the Chicago Police Department Narcotics Section. I was so assigned on March 30, 1987. On that date I was assigned to a special detail in the narcotics section. I was assigned to the Airport Squad which deals with drug interdiction at the airports and train stations.

On March 31, 1987, I saw Bruce Jones at the Union Station in Chicago, Illinois. I first saw him at approximately 9:10 to 9:20 A.M. as he was leaving a train or getting off a train that had just arrived in the station. I was located in the waiting room area which is just inside from where the trains pull in.

The first agent that approached Mr. Jones was Captain Farry the Amtrak police. He first approached Mr. Jones at the top of an escalator at the mezzanine area which exits out to the other areas of the station. I observed Mr. Jones as he entered into the station and up until the time that he was approached by the Amtrak officer and this was after he had gone up the escalator to the mezzanine level.

I then approached him and identified myself to Mr. Jones. I told him I was a Chicago police officer and I showed him my identification from the Chicago Police Department. I was in plain clothes as was Captain Farry. As I was approaching I heard Captain Farry say that he was from the Amtrak police. After I identified myself I questioned Mr. Jones and during the questioning at one point *I asked him if I could search his bag. He said he did not wish to give consent.* I did not then immediately go into the bag.

Later I did search the bag which was a carry-on bag that he was carrying. I did not have a search warrant nor did any other officer, nor did we have an arrest warrant. I took statements from defendant after his arrest which was after he was first approached by the Amtrak investigator.

When I saw him in the Union Station I did not observe him to violate any local ordinance or state statute. Nor was I in any fear of my life or any type of harm from the defendant." (Emphasis added.)

Cross-examination by the assistant state's attorney:

"I have been a police officer 13 years and doing narcotics in-

vestigation work for about one year. During those 12 years I was assigned to Youth Special Investigations which was narcotic investigations involving juveniles. Then I was assigned to the narcotics section of the Chicago Police Department, the Conspiracy Task Force, in cooperation with the Federal Drug Enforcement Administration and also this Task Force working on drug interdiction at the airport and train stations.

On this date, I was awaiting the arrival of the train at the Union Station with Officer Glynn and Sergeant Powers of the Chicago Police Department, Captain Farry and Detective Dennis Kroll from the Amtrak Police Force, along with Special Agent Mel Scabilion of the Drug Enforcement Administration. We were awaiting the arrival of Amtrak Train No. 29. *We had information from Detective Kroll of Amtrak Police that there was a party travelling from Ft. Lauderdale, Florida to Chicago via Washington, D.C. on a one-way ticket from Ft. Lauderdale, and also that this party had made several other trips of this sort before. This particular passenger was Bruce Jones.*

*At approximately 9:20 a.m. I saw Bruce Jones de-board that particular train.* He was with another male. As Mr. Jones walked through the Union Station he walked without any hesitation through the waiting area through the rest of the station up to the stairwell. But as he was walking through he kept turning around looking behind him and *he made eye contact with me several times* and the other officers as we were surveiling him through the station. There were possible [*sic*] hundreds of people in the station at this time. *The defendant made eye contact with me several times* and I observed him ride up the escalator to the mezzanine level and as he was riding up the escalator *he made eye contact with me one or two times.*

When he exited the escalator on the mezzanine level it was at that point when Captain Farry approached him. I joined Captain Farry shortly thereafter. The area where the escalator ended was the mezzanine area and there were exit doors onto other areas onto the street and below to the bank. It's well lit, well trafficked. There were other passengers going up and down the other escalator and stairs and many people going pass [*sic*] us. It was very, very crowded at that time.

Upon approaching the defendant I identified myself as a Chicago police officer and I showed him my identification

which is my badge. I was standing alongside the defendant but I was not touching him in any way, nor grabbing his arm. No one was standing in front of the defendant and the defendant was not pinned up against the wall or the counter. In front of the defendant as I identified myself were the exit doors. Besides Captain Farry, Agent Mel Scabilion was with me. Neither was Officer Kolman, Agent Scabilion or Captain Farry at any time touching the defendant. I did not display my weapon.

*I asked both gentlemen if they would agree to speak with us* and they said yes and agreed to speak with us. *At that time I asked both of them for a copy of their train ticket and some identification or driver's license,* and I received an Illinois Driver's license from both gentlemen and a copy of the travel itinerary, the tickets from Mr. Jones for travel on March 26th via airplane to Ft. Lauderdale and return via train on March 29th. After reading the license I learned that the other man was Edward Borner. I read the documents and returned them to Mr. Jones and Mr. Borner.

At that time I explained that we were conducting a narcotics investigation and I had asked both of them how long they had been in Florida and if they were there on business or pleasure. Mr. Jones stated that he had been there since the previous Thursday and was there on vacation. March 31, 1987 was a Tuesday. Mr. Jones at that point asked me what is this all about and I again explained that we were conducting a narcotic investigation and I had asked Edward Borner and Bruce Jones if they had any illegal narcotics on their person or in their baggage. Both of them replied no. At that time I told them they were not under arrest, they were free to leave at any time.

During this conversation my voice was not raised above a conversational tone at any time. At that point I asked Mr. Borner and Mr. Jones if they would give us consent to search their bags. I told them that they had a right to refuse such consent also. At that time, Mr. Borner said, yes, go ahead and search his bag. I then looked toward Mr. Jones and he did not respond to my question but appeared very nervous and he was physically shaking, trembling. Prior to that he had not been shaking or trembling.

Since Mr. Jones did not respond *I again asked him if he would give a consent to search his bags and at that time he said he did not wish to give consent.* I again told him that

they were free to leave and they were not under arrest. And then *I further explained that I was going to temporarily detain Mr. Jones' bag.*

The purpose was to subject it to an inspection by a narcotics detector dog, and if the dog did alert to the bag I would get a search warrant. The dog that would sniff the bag is trained for narcotics detection and this is their means to detect. Mr. Jones then said that I could search his bag, that he had narcotics in it, but was carrying it for someone else. He just blurted this out. No one was touching him or grabbing him at that point. My weapon was not drawn nor did anyone else have their weapons drawn. No one was threatening the defendant in any way. His movement or progress was not blocked in any way at that point. He did not express a desire to leave the area or cease the conversation.

I then searched the bag and recovered a clear plastic bag containing white powder. I believed it to be cocaine. I then placed the defendant under arrest. *I did not place Mr. Borner under arrest because his bags were searched and there was nothing found in his bags.*" (Emphasis added.)

Redirect examination by the defendant's attorney:

"*The day before this incident I had received information that Mr. Jones was going to be on this particular train.* I believed the ticket was purchased through a travel agency but I don't recall if it was by check or credit card. I do not believe that I was aware on March 30th that Captain Farry of Amtrak had received information that the defendant had purchased a ticket for this trip through an American Express credit card. I know that he had purchased the ticket through a travel agency and there's nothing wrong with purchasing a ticket through a travel agency. I have no idea how many persons on the train that day had purchased tickets through travel agencies. *On March 30th I was given the name of Bruce Jones but was not given any photograph as to what Mr. Jones looked like.* When Mr. Jones got off the train he looked at me a number of times, several times.

As Mr. Jones went up the escalator he did not appear nervous but turned around several more times and looked at the surveillance officers, not just me. As far as I know he was looking behind at us which would have been myself and Agent Scabilion. When he got up to the end of the escalator he started walking toward the exit and Captain Farry approached

him. There were other people behind Mr. Jones getting off the escalator. Captain Farry and Bruce Jones continued to stand five feet from the escalator and that's where they stood as I got off. Officer Kroll from Amtrak was about 10 or 15 feet away from me and Officer Glynn was a good distance away. I don't recall him being any where in the near proximity of me and Agent Scabilion. Sergeant Powers was out of my view, I don't know where he was. Sergeant Powers did not come over.

*I don't recall whether I received the information that the defendant was travelling from Ft. Lauderdale through Washington to Chicago on the 30th or the 31st.* As soon as I identified myself and Agent Scabilion identified himself, Captain Farry walked away from us but stayed within 50 feet. There was nothing unusual about Mr. Jones' answer that he had been in Florida on vacation since Thursday.

The first time I asked him whether I could search his bag he didn't respond. *I asked him again and if he would give a consent to search his bag and he stated he did not wish to give his consent.* At that time the other officers were still standing there talking to him in the area. Based upon my experience where there are other officers present it is unusual for a person to be nervous in talking to the officers. I opened up the bag and found an item wrapped in plastic. That plastic bag was wrapped in a newspaper and I opened up the newspaper.

Besides the fact that the defendant appeared nervous, as I have described, glanced over his shoulder a couple of times at me and the other agents, I also considered it unusual that I had previous knowledge that he was travelling on a one-way train ticket, and I observed that he also went down there on a one-way plane ticket, and that he had made several previous trips down to Florida. I considered that unusual on March 31st. *The information that I had received came from the Amtrak Police personnel on March 30th and March 31st. I knew that we were investigating somebody named Bruce Jones and I received that information the first time, as I recall on March 30th.*" (Emphasis added.)

There was no other testimony or evidence admitted during the motion to suppress evidentiary hearing.

Officer Kolman's foregoing testimony demonstrates a compelling reason why Judge Grady's admonition in *Freymuller* should not go unheeded in the instant case, or in the other two practically identical

cases by these same officers, hereinafter discussed. Judge Grady warned in *Freymuller*:

> "It may not be too difficult to recall, after the fact, that the person stopped without an articulable basis for suspicion actually was behaving quite suspiciously before the stop. *** The pressure on a police officer to make an indictable case when he has recovered contraband must be considerable. *The temptation to color the facts to support a prosecution of an individual who, after all, has just been found to be violating the law is obvious.*" (Emphasis added.) *Freymuller*, 571 F. Supp. at 67.

It appears from Officer Kolman's testimony that the officers learned for the first time the identity of Bruce Jones when they stopped and questioned him, and perhaps likewise learned, also for the first time, from him, his traveling itinerary. Significantly, unlike in *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, and the *Draper* progenies, Officer Kolman did not testify that she, or any other officer was given, or had any race, physical, wearing apparel or any other description of Bruce Jones, from any source. Indeed, no such information could likely have been forthcoming to Officer Kolman via Jones' ticket purchase, as stated by Officer Kolman. How these officers were able to identify Bruce Jones from among the many passengers who were in the terminal is not revealed in the record before us, except, perhaps, as Judge Grady cautioned in *Freymuller*, all the information about Jones was first acquired by the officers only after they stopped and questioned him.

It is also significant that Officer Kolman did not at any time testify that she, or any other officer, had been informed by anyone or had any knowledge whatsoever that defendant Bruce Jones, or his traveling companion, Edward Borner, was in any way or to any degree involved in any narcotics. Yet *both* these American citizens, alighting from a public conveyance, in a public place, were stopped, interrogated and required to produce and present to law enforcement officers their identification and explain their itineraries to them.

These police state tactics and inquisitions, of stopping and grilling two American citizens, and requiring them to justify their travels to the officer, reek of the police state tactics known to exist in Hitler's Germany, Communist China and the Soviet Union, and totalitarian South Africa, where citizens are prohibited from traveling except by police permission in the form of police-issued traveling passes. I distressfully note that uniformed armed guards, regularly stationed at the entrances to this public building in downtown Chi-

cago, the Daley Center, in which this court and the judges' chambers of this court are located, prohibit citizens, including the judges, access to the building above the first floor except upon the citizen (judges included) presenting an admission pass issued by the sheriff, or upon the citizen being searched. With equal grief, I also note that identical prohibitions, restrictions and conditions are imposed on American citizens at the downtown, public Everett M. Dirksen Federal Court Building. Americans and other freedom-loving people have freely given their very lives against such police tactics and governmental regimes.

Clearly, the officers had no probable cause to stop Bruce Jones or Edward Borner. The trial court obviously recognized this drastic constitutional deficiency and therefore predicated the validity of this regiment of six armed officers surrounding, stopping, interrogating, demanding identification, threatening to seize and searching Jones' luggage on the dubious and fallacious ground of consent. I will not express my concerns or speculate on the possible volatile consequences had either Jones or Borner further verbally, or Heaven forbid, physically resisted.

After hearing this testimony, and argument of counsel, the trial court stated and ruled:

"Well, I think we really have two issues here; first of all is the issue, which is the simplist as far as I'm concerned, is the issue the right to search the bag the right to touch the bag. There is no question about it. Once they said they were going to hold the bag, relying upon *United States v. Blake*, they had a right to detain it for a short period of time. They have the dogs sniff it and thereafter obtain the search warrant if the dogs basically came up with anything positive. When the defendant knew this and said 'you can search the bag, I've got narcotics in it but it doesn't belong to me, it belongs to somebody else,' [they] had probable cause for the arrest, *and they also had probable cause for the search as well as the consensual search* at that time when the defendant was basically—the narcotics he says it doesn't belong to him, it belonged to somebody else. The second issue, the main issue, is the initial stop and the cases break down into two key words and *is it a seizure or is it what they call in these cases a consensual encounter*. We talk about seizures basically which you rely upon is basically one written by Justice McGloon and that basically is *People v. DeLise*. And that basically says that any stop at all is a freedom of restraint and is a seizure. However, if you look

at all the cases which follow thereafter, *People v. Myler* and also *People v. Britt* which you cited in your motion, basically nobody follows that case. That case was the initial case. There was one written thereafter by Justice Wilson who attempts to distinguish it but it was all changed by law when the United States Supreme Court came down with *Florida v. Rudegast* [*sic*] as well as I believe the *Royer* case, *Florida v. Royer*. So based upon the law which I have here I disagree. He was stopped in an area here where it was easily accessible. *It was nothing more as the Courts referred to as a consensual encounter as opposed to a seizure. Therefore, based upon the law as I see it at the present time the Motion has to be denied.*" (Emphasis added.)

### III

It is patently clear from Officer Kolman's testimony that there was no voluntary consent in this case and that the seizure and search of Jones' luggage was premised on police coercion and duress, expressed and implied.

Presumably, we agree that in order for a custodial arrest and search of the defendant to have occurred, probable cause to arrest him must have existed. However, we need not reach this question, because a divided Supreme Court has held that police officers have a right to approach a complete stranger in an airport, in a bus depot, a train station, on the street, or in any other public place and request permission to speak and/or question the stranger, *so long as it is at all times clear to the person so approached that he or she maintains the right at all times to refuse to answer any questions and to walk away.* This is exactly what *Florida v. Royer* held:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Citations.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation.] The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations.] *He may not be detained even momentarily without reasonable, objective*

*grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds."* (Emphasis added.) *Florida v. Royer,* 460 U.S. at 497-98, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.

So I agree that when Officer Kolman approached Bruce Jones and his companion at about 9:10 a.m. on March 31, 1987, at the Union Station in Chicago and identified herself as a police officer and requested permission to speak to them, Officer Kolman was on the fair and legal side of the foul line. Likewise, where the record clearly shows that no force or physical restraint was employed upon the defendant or his companion, and the defendant agreed to answer Officer Kolman's questions about his vacation, his travel itinerary, etc., Officer Kolman was still within the proper scope of her authority. Officer Kolman next asked the defendant for permission to search his luggage. Again, this was proper on the state of this record, and had the defendant then said *at that point,* "You can search my bag, I've got narcotics in it but I am carrying it for someone else," probable cause surely would have immediately existed for the search of the bag, the seizure of the contraband, and the arrest of the defendant. Had that occurred the defendant's motion to suppress would (and should) have been properly overruled, the defendant properly convicted, and I would not be writing this dissent. But that is not what the record reveals was the sequence of events, though one would believe so from reading the majority opinion.

What occurred is that when Officer Kolman asked the defendant for permission to search his bag, the defendant immediately refused to give his consent. This is made abundantly clear by Officer Kolman's testimony. After stopping the defendant and questioning the defendant about his whereabouts, the purpose of his trip, etc., Officer Kolman testified as follows, in response to questions put to her by the assistant State's Attorney:

"Q. Now, at that point did Mr. Jones say anything to you?

A. Yes, then he asked me what is this all about.

Q. What did you say?

A. I again explained that we were conducting a narcotic investigation and *I had asked Edward Borner and Bruce Jones if they had any illegal narcotics on their person or in their baggage.*

Q. *What was the response to that question?*

A. *Both of them replied no.*

Q. What, if anything, did you say next?

A. At that time I told them they were not under arrest,

they were free to leave at any time.

Q. Now during this conversation, Officer Kolman, was your voice raised above conversation tone at any time?

A. No, sir.

Q. What, if anything, did you say at that point?

A. *At that point I asked both Mr. Borner and Mr. Jones if they would give us consent to search their bags.*

Q. *Did you tell them about any rights they would have regarding that consent?*

A. *Yes, I did. I told them that they had a right to refuse such consent also.*

Q. Okay. What, if anything, did Mr. Borner say at that time?

A. At that time Mr. Borner said, yes, go ahead.

Q. As to what?

A. Go ahead and search his bag.

Q. *Did you at that point look towards Mr. Jones?*

A. *Yes, I did.*

Q. *Did he respond to your question?*

A. *No, he didn't. And he appeared very nervous and he was physically shaking.*

Q. Was he trembling?

A. Yes, sir.

Q. Prior to you asking the question whether you could search his bag was he trembling or shaking before that?

A. No, sir.

Q. It was only after you asked him the question, is that correct?

A. That's correct.

Q. Okay. What happened next, Officer Kolman?

A. *Again since I didn't—since Mr. Jones did not respond I asked him if he would give a consent to search his bags; consent for us to search his bags.*

Q. *And what, if anything, did Mr. Jones say?*

A. *At that time he said he did not wish to give a consent.*

Q. Okay. What if anything did you say at that point?

A. I again told him that they were free to leave and they were not under arrest. And *then I further explained that I was going to temporarily detain Mr. Jones' bag.*

Q. *For what purpose?*

A. *I was going to subject it to an inspection by a narcotic detector dog and if the dog did alert to the bag I would get a*

*search warrant.*

\* \* \*

*Q. Now, at that point after explaining to Mr. Jones about the narcotic detective [sic] dog did he say anything to you?*

*A. Yes, he did.*

*Q. What did he say?*

*A. He says, you can search my bag, I've got narcotics in it but I'm carrying it for someone else."* (Emphasis added.)

Later, on further examination by the defense attorney, Officer Kolman testified:

*"Q. Now, it wasn't until after Mr. Jones denied you permission to search his baggage that you told him that you would keep his bag there and have it sniffed or checked-out, correct?*

A. Not in those words, but *yes.*

Q. Ok. So you gave Mr. Jones a choice between leaving his bag with you and walking away from it or having it searched, right?

*A. I didn't state it that way, no.*

*Q. Well, you told him that you would detain his bag, correct?*

*A. That's correct.*

*Q. And you told him that after he had denied you permission to search the bag, didn't you?*

*A. That's correct.*

*Q. And it wasn't until after you told Mr. Jones that you would detain his bag and have it checked, it wasn't until after that that he then said 'Ok you can search the bag,' is that correct?*

*A. That's correct."* (Emphasis added.)

Thus, the record is abundantly and unequivocally clear that the defendant refused to give his voluntary consent to Officer Kolman to search his bag and that he only relented after being told by Officer Kolman that the police would retain his bag. What should have been manifestly clear to Officer Kolman was that the defendant's "cooperation" with Officer Kolman had ceased and that, in the words of *Florida v. Royer,* the defendant should not have been further "detained even momentarily without reasonable objective grounds for doing so." (*Florida v. Royer,* 460 U.S. at 498, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324.) Officer Kolman should have and must have realized her constitutional obligations and duties at that point—after all, she was a policewoman with 13 years of considerable and wide-ranging experience, especially in the enforcement of the controlled substances

statutes. What Officer Kolman did, however, was immediately inform the defendant upon learning of his refusal to voluntarily consent to the search of his bag that she and the other officers were going to seize the bag forthwith and submit it to a dog-sniff test by a narcotics unit canine. And it was these statements by Officer Kolman which coerced and induced the defendant to involuntarily submit to the search of his luggage.

The proper questions to be resolved, therefore, are whether Officer Kolman possessed the right to seize the bag and hold it and submit it to a dog-sniff test. If the answer to that question is "yes," then the defendant's "consent" was irrelevant and his statements were properly obtained; if the answer is "no," then both the "consent" and the "statement" are the product of Officer Kolman's illegality.

Unfortunately, the trial court did not focus at all on these questions and neither does the majority opinion. Both the trial court and the majority opinion erroneously assume that agents of the law have some inherent right to seize a passenger's luggage for any reason, or, indeed, for no reason at all, and to submit that luggage to some "treeing" or "pointing" dog, against the will of the passenger so long as the passenger is himself or herself not seized. However, under either the latest authorities from the United States Supreme Court interpreting the fourth amendment, or under an independent evaluation of Illinois statutory and case law, officers of the law have no such right, as the following discussion clearly establishes.

IV

The seizure of a traveler's luggage is permitted under the fourth amendment only on facts and to the identical extent that the officer could seize the traveler himself. One might assume that the United States Supreme Court permits the seizure of luggage on some lesser standard than, say, "articulable suspicion," which is the minimum standard permitted for the seizure of a person under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, because one might further assume that the United States Supreme Court accords greater privacy rights to the "person" than to the "effects" protected by the express terms of the fourth amendment. But such an assumption would be erroneous because the United States Supreme Court specifically declared in *United States v. Place* (1983), 462 U.S. 696, 77 L. Ed. 2d 110, 103 S. Ct. 2637, that no distinction between seizure of a person and the seizure of baggage can be made:

"At the outset, we must reject the Government's suggestion

that the point at which probable cause for seizure of luggage from the person's presence becomes necessary is more distant than in the case of a *Terry* stop of the person himself. The premise of the Government's argument is that seizures of property are generally less intrusive than seizures of the person. While true in some circumstances, that premise is faulty on the facts we address in this case. The precise type of detention we confront here is seizure of personal luggage from the immediate possession of the suspect for the purpose of arranging exposure to a narcotics detection dog. Particular in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary. The person whose luggage is detained is technically still free to continue his travels or carry out other personal activity pending release of the luggage. Moreover, he is not subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained. Nevertheless, such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return. Therefore, when the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." 462 U.S. at 708-09, 77 L. Ed. 2d at 121-22, 103 S. Ct. at 2645.

Thus, under the authority of *United States v. Place*, Officer Kolman's right to seize the defendant's luggage for inspection was exactly the same and identical to her right to seize the defendant's person for the same purpose. We all know that under such authorities as *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, and *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581, the police may temporarily seize a person if they possess reasonable articulable suspicion that the seized person is committing, has committed, or is about to commit a crime. We all also know that under *United States v. Place*, luggage may be constitutionally seized only if the police possess the same reasonable articulable suspicion that the baggage contains contraband. The proper test for seizure is the same as between

a person *vis-a-vis* his luggage. Thus, the question remains, did Officer Kolman possess a reasonable articulable suspicion that Bruce Jones' luggage contained contraband at the moment she announced her intention to seize it?

The majority cites the following factors which it deems individually significant and collectively sufficient to justify the seizure of the defendant's luggage: (1) defendant repeatedly made "eye contact" with the officers in the train station; (2) the defendant's travel itinerary indicated he had flown to Ft. Lauderdale from Midway Airport in Chicago on March 26, and that he left Ft. Lauderdale on March 29 on a train to Chicago; and (3) the defendant appeared nervous when questioned. None of these "reasons" could possibly justify the seizure of the defendant, or, under *United States v. Place*, supply the articulable suspicion necessary to conclude that the defendant's luggage contained contraband.

1. *Eye contact.* How, on this record, eye contact with Officer Kolman could be considered suspicious behavior defies imagination in light of the trial judge's explicit "finding" that Officer Kolman is "a nice looking lady." If it has become suspicious for a man to look at a "nice looking lady" (particularly where the lady is obviously looking back at him), then many judges may find themselves detained. At least one authority (*United States v. Pulido-Santoyo* (9th Cir. 1978), 580 F.2d 352, 354) has said that eye contact with the police is not suspicious but may well be "quite natural" under these circumstances. This "reason" for suspicion is patently flawed.

2. *Defendant's itinerary.* The fact that the defendant traveled roundtrip between Ft. Lauderdale and Chicago in the space of a few days does not create an articulable suspicion sufficient to seize either the defendant or his luggage. According to *Terry v. Ohio* (1968), 392 U.S. 1, 27, 20 L. Ed. 2d 889, 909, 88 S. Ct. 1868, 1883, an articulable suspicion is something more than an "inchoate and unparticularized suspicion or 'hunch.' " In *United States v. Sokolow* (1989), 490 U.S. 1, 104 L. Ed. 2d 1, 109 S. Ct. 1581, the Court specifically held that a 48-hour trip between Miami and Honolulu during the month of July "is not by itself proof of any illegal conduct and is quite consistent with innocent travel." (490 U.S. at 9, 104 L. Ed. 2d at 11, 109 S. Ct. at 1586.) But if the additional combination of factors which the Court held justified the stop in *Sokolow*—paying cash for the tickets from a large roll of $20 bills, and traveling under a false name—certainly the opposite factors in the case at bar—Jones' use of a credit card and his correct name—create the opposite conclusion. Thus, there was nothing about this defendant's itinerary which

created an articulable suspicion that the luggage contained contraband.

3. *Nervousness*. Officer Kolman testified that the defendant appeared nervous. The Illinois Supreme Court has specifically held that "nervous" behavior exhibited by one stopped by the police will not justify a subsequent police search. (*People v. Reed* (1967), 37 Ill. 2d 91, 227 N.E.2d 69.) Nothing in the record suggests that the officers believed the defendant to be armed or otherwise dangerous. See *People v. Galvin* (1989), 127 Ill. 2d 153, 535 N.E.2d 837; *People v. Jones* (1989), 181 Ill. App. 3d 576, 537 N.E.2d 395.

Thus, none of the factors relied upon by the majority, taken singularly or jointly, justified the seizure of the defendant or his luggage. It follows, therefore, that when Officer Kolman told the defendant that she was going to seize (and search) his luggage, thereby coercively inducing the defendant to yield, Officer Kolman was acting illegally. That is to say, the defendant's submission to search his bag was illegally procured and could not serve, within the Constitution, as a valid basis for Officer Kolman's search of the defendant's luggage.

When a search is conducted without a warrant, or probable cause, and the validity of the search turns upon the defendant's purported consent, as here, the State has the burden of proving that the necessary consent was freely and voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 233-34, 36 L. Ed. 2d 854, 866-67, 93 S. Ct. 2041, 2051.) The test to be employed in determining the voluntariness of the consent is the totality of the circumstances. Knowledge by the arrestee that he has a right to refuse consent to search is one factor in determining voluntariness, but is not, by itself, determinative. The burden of demonstrating consent based upon the totality of circumstances is on the State. (*United States v. Mendenhall* (1980), 446 U.S. 544, 557, 64 L. Ed. 2d 497, 511, 100 S. Ct. 1870, 1879.) Furthermore, it is well established that consent extracted in submission to an assertion of lawful authority is not free and voluntary, but rather is duressed and coerced. (*Bumper v. North Carolina* (1968), 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788.) And that, of course, is what we have here. It is beyond dispute that this defendant refused to yield to the search of his bag *until* after Officer Kolman informed him that his bag was going to be retained by them, whether or not he consented. That "consent," given then, and only then, was given in submission to Officer Kolman's demand to seize his bag, and, under *Bumper*, cannot be considered to be free and voluntary.

Moreover:

"[A] finding that the defendant's consent to search was voluntarily given is but one step in the determination of the propriety of the search, because even if the consent were voluntary it may still have been obtained by the exploitation of an illegal arrest. *** What is of concern is whether some inculpatory action by an arrestee, albeit voluntary, was obtained by the exploitation of an illegal arrest by a police officer, which as a consequence violates the constitutional safeguards of the fourth amendment so as to require application to the exclusionary rule. The inculpatory action on the part of the arrestee can take the form of a consent to search just as easily as it can a confession, and for purposes of the fourth amendment there is no substantive difference between the two." *People v. Odom* (1980), 83 Ill. App. 3d 1022, 1027-28, 404 N.E.2d 997, 1002.

In *Odom*, the court held that the defendant had been illegally arrested and therefore his "consent" to search his truck and his jacket which was in the truck was the product of the illegal arrest. (See also *People v. Koniecki* (1985), 135 Ill. App. 3d 394, 481 N.E.2d 973.) The holding in *Odom* is in accord with the general principle that the exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct. *Segura v. United States* (1984), 468 U.S. 796, 82 L. Ed. 2d 599, 104 S. Ct. 3380, quoting from *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; see also *United States v. Miller* (11th Cir. 1987), 821 F.2d 546, 549-50; *United States v. Berryman* (1st Cir. 1983), 717 F.2d 651, 656-57; *United States v. Delgadillo-Velasquez* (9th Cir. 1988), 856 F.2d 1292, 1299-1300.

The defendant's coerced submission "consent" was proffered immediately after and only as a direct result of Officer Kolman's illegality, namely, her expressed threat and intent to seize the defendant's bag.

I conclude on this record that Officer Kolman had no evidentiary support or basis for any articulable suspicion that the defendant was committing, had committed or was about to commit a crime or that the defendant's luggage contained contraband when she threatened and expressed her intent to seize it; that the defendant's submission or purported "consent" to search his luggage was involuntary and was given only in deference to a claim of lawful authority; that the defendant's "consent" was the product, "fruit" and direct result of Officer Kolman's illegal and unconstitutional threat to seize the

defendant's luggage, and therefore the trial judge's overruling and denying the defendant's pretrial motion to suppress evidence was manifestly erroneous. *People v. Stout* (1985), 106 Ill. 2d 77, 477 N.E.2d 498.

I am constrained to point out that just a few weeks ago in *People v. Nelson* (1989), 188 Ill. App. 3d 619, this very court affirmed the trial court's allowance of the defendant's motion to suppress evidence, which police seized from his luggage, on more distinct factors to establish a reasonable, articulable suspicion than the factors on which Chicago police officers Christine Kolman and Robert Glynn and Amtrak security officer Dennis Kroll relied in the case at bar. Parenthetically, I also note that in *Nelson*, and in the case at bar, the officers, the train station, the train, the train's origin and the train's time of arrival are all the same, and too, the officers' "boiler plate" factors to establish their articulable suspicions in the two cases are likewise practically identical. The sage condemnation of Justice Walter A. Schaefer in *People v. Mitchell* (1970), 45 Ill. 2d 148, 158, on the wholesale use of "boiler plate affidavits" has gone unheeded by the learned trial judge and my distinguished brethern in the case at bar.

These officers' "9:10 a.m. March 31, 1987," stop and interrogation at Union Station in Chicago of Bruce Jones, who had just arrived on a train from Washington, D.C., was only five weeks after these same officers' "9:20 a.m. February 24, 1987," similar stop and interrogation at Union Station in Chicago of Michael Nelson, who also had just arrived on a train from Washington, D.C. I extensively quote *Nelson*; the *Nelson* factors are so closely analogous to the instant case they appear to be a script.

> "The defendant was traveling on Amtrak from Delray Beach, Florida, to Portland, Oregon. He was required to change trains in Washington, D.C., and again in Chicago. At the hearing on the motion to suppress, the defendant presented the testimony of Chicago police officer *Robert Glynn*. Glynn stated that at 9:20 a.m. on February 24, 1987, he and *his partner Christine Kolman observed the defendant exit an Amtrak train at Union Station*. Glynn had been informed by Amtrak security that the defendant had paid cash for a one-way ticket from Delray Beach, Florida, that he had occupied a roomette on the train, and that he cancelled his reservations on 'a couple of occasions.' Glynn stated that *the defendant was looking around as though 'scanning the crowd for surveillance'* and appeared to be leaving the station without putting his

bags in storage. He further testified that Florida is a 'source state' for drugs.

At that time, *Glynn and Kolman approached the defendant,* identified themselves and asked for identification and the defendant's train ticket. The defendant produced his Oregon driver's license and the train ticket which was purchased in his own name. Glynn informed the defendant that he was not under arrest and asked if he would answer some questions. The defendant indicated that he would. When asked where he boarded the train, the defendant answered Washington, D.C. Glynn then asked why the train ticket indicated that he had boarded the train in Delray Beach, Florida. *The defendant became nervous, began stuttering and changed his weight from one foot to the other.* In response to further questions, the defendant stated that he was once arrested for possession of marijuana and that he was not carrying illegal narcotics. He refused to give the officers permission to search his luggage, and Glynn decided to detain the bags for exposure to a narcotics detector dog. Glynn told the defendant that he was free to leave and gave him a receipt and a phone number he could call for the return of his luggage.

The defendant left and the bags were inspected by a narcotics detector dog immediately outside of Union Station. The dog indicated the presence of narcotics in one of the bags. A search warrant was prepared and the bag was found to contain two kilos of cocaine.

The State presented the testimony of *Dennis Kroll, an Amtrak security officer* who reviews passenger reservations by computer. Kroll stated that the defendant paid $585 in cash for a one-way ticket originating in Delray Beach, Florida. He ordered a sleeping compartment called a roomette, changed his reservation five or six times and did not leave a call-back number. Kroll relayed this information to an agent of the Drug Enforcement Administration. \*\*\*

\* \* \*

In the case at bar, the State contends that the following factors established a reasonable, articulable suspicion that the defendant's luggage contained narcotics. The defendant purchased a one-way cash ticket from Florida, a 'source state'; he occupied a roomette; he changed his reservations several times and did not leave a call-back number; he 'scanned' the area when he exited the train and appeared nervous when ques-

tioned by the police; and he was not truthful when he said that he boarded the train in Washington, D.C.

*** Although the ticket was purchased with cash, which presumably would be done to ensure anonymity, the defendant purchased the ticket in his own name. The officers were aware of this when the defendant produced an Oregon driver's license bearing his name and photograph. The trial court specifically found that the defendant answered truthfully when he said he boarded the train in Washington, D.C., based on the fact that he changed trains there. Given the fact that the defendant was not from Chicago and had to change trains in Union Station, no significance can be imparted to the fact that he 'looked around' after exiting the train. The witnesses did not explain the significance of the reservation changes or the fact that the defendant occupied a sleeping compartment during his journey from Florida to Oregon. In our view these factors, even when considered together, are insufficient to establish a reasonable, articulable suspicion that the defendant's luggage contained narcotics.

Accordingly, the judgment of the trial court is affirmed." (Emphasis added.) *Nelson*, 188 Ill. App. 3d at 619-22.

Regarding the factors to establish the officer's reasonable articulable suspicion, the majority's holding in the case at bar cannot be reconciled with this court's opposite holding in *Nelson*. It is quite apparent that the meager factors in *Nelson* to establish a reasonable articulable suspicion are far more persuasive than the lesser, scanty factors relied on by Officer Kolman to seize and subject Jones' luggage to a dog detector test in the instant case.

The script continues. Again, on February 3, 1987, again at 9 a.m., again these same officers, Robert Glynn, Mel Scabilion, Dennis Kroll, again at the same Amtrak train station, again identically stopped and questioned defendant, John Sherman and his companion who had alighted from the same Washington, D.C., train, again en route from Fort Lauderdale, Florida, to Lapeer, Minnesota, and again this same court, on November 2, 1989, affirmed the trial court's order suppressing as evidence the drugs seized from the defendant's luggage, in *People v. Sherman* (1989), 190 Ill. App. 3d 814. In *Sherman*, this court rejected the State's contention that the following factors established a reasonable, articulable suspicion that the defendant's luggage contained narcotics: the defendant and his companion occupied a roomette paid for in cash under the name Rosenstock; neither man was named Rosenstock and the call-back num-

ber they left was that of a hotel at which no one named Rosenstock was registered; they traveled from Fort Lauderdale, a "source" city for drugs, and walked separately through the Amtrak station. Likewise, in the case at bar, there were no factors which established a reasonable, articulable suspicion that defendant Jones' luggage contained narcotics, and Officer Kolman's threat to seize his luggage was clearly constitutionally invalid.

Again, we do not know how many innocent passengers these same and other officers have stopped and interrogated. However, Chicago police officer Richard Crowley recently related that during the past five years, he has been assigned to surveil and interview drug courier profile passengers at Chicago train stations, Midway and O'Hare airports, that he watched "probably" 20 flights and "probably talked to a dozen or fifteen people" on a typical 10 a.m. to 6 p.m. day, about 60 people a week for a five-day week, and that "we don't come up with narcotics every day, maybe a couple times a week," and that "some weeks [he was] wrong one hundred percent of the time."

Chicago police officer Richard Crowley, responding to the revealing examination of attorney Marc W. Martin, so testified on his deposition on October 19, 1989, in the cause United States v. $17,750, No. 87—C—8706, a forfeiture proceeding in the United States District Court for the Northern District of Illinois, Eastern Division, Chicago, Illinois, the Honorable Ilana Rovner, trial judge. Crowley further disclosed the following on said deposition:

"Q. Now, is there something called a drug courier profile?

A. Yes.

Q. What is that?

A. It has to do with behavior.

Q. Can you be a little more specific?

A. Well, counter-surveillance would be a good word.

Q. What is a drug courier profile?

A. Well, it deals with couriers that are clandestinely carrying, trafficking drugs.

\* \* \*

Q. Would you list those characteristics?

A. Well, a clear explanation would be someone pretending to make a phone call when in fact, they were just looking all around the area, with the phone receiver up to their head.

\* \* \*

Q. What is counter-surveillance besides pretending to make a phone call?

A. Counter-surveillance is when a subject would look around to see if anyone was surveilling him.

* * *

Q. What are other parts of it?

A. Standing off in a corner and hiding in a corner, so to speak, and watching every one else in the area.

* * *

Q. A drug courier profile is a list of things you're supposed to look out for to see if this person fits the profile, isn't that true?

A. Yes.

Q. What are the things you are to look out for?

A. Well, we look for couriers coming into Chicago from source cities of controlled substances, or going out of such cities.

Q. [What] characteristics do you look for?

A. Anything out of the ordinary: a nervous behavior, hiding in a washroom until a plane leaves, possibly.

Q. So you don't know any of the other items in this drug courier profile *** basically involves counter-surveillance, nervous behavior?

A. Yes.

Q. How about dress. Does dress have anything to do with it?

A. No.

* * *

Q. Type of luggage that anyone is carrying?

A. Well, we look for carry-on bags, that lends them to this profile.

***

A. Well, a stereotype courier would be a person casually dressed, leaving the plane in a hurry, looking all about, with a small carry-on bag and negating baggage pickup and exiting the airport for a cab.

Q. Now, this example you just used, would that type of person fit the profile of a drug courier?

A. Yes."

Parenthetically, I note that many, and indeed perhaps most, if not practically all current airline travelers fit this profile of a drug courier.

Officer Crowley additionally deposed:

"Q. So you are talking to 60 people a week, 50, 60 people?

That's a fair estimation?

A. Yes.

Q. You say on some weeks you find no narcotics?

A. That true.

Q. And these 50, 60 people you stop, it's because they meet the profile?

A. The 50 or 60 people that we interview *meet the profile somewhat.*

Q. [Because] they meet the profile, in your estimation?

A. *They would meet some criteria of the profile.* Oftentimes, you will start to conduct an interview and not get very far with it, when we ascertain that they're not anyone we're interested in, we're not any longer interested in interviewing this person any further; *like if their papers are in order."* (Emphasis added.)

I additionally parenthetically note that traveling citizens in totalitarian nations are likewise permitted to resume their travel when the Gestapo, Cheks, NKVD, MVD, OGPU and the KGB similarly determine that *"their papers are in order."*

Officer Crowley further related on his deposition:

"Q. And when you stop these—or question as you use the word, *these 50 or 60 people per week,* it's because something about their behavior made you think *they might be involved in narcotics,* it that a fair statement, officer?

A. *Yes.*

Q. *And some weeks you're wrong one hundred percent of the time?*

A. *Yes."* (Emphasis added.)

This foregoing testimony of Officer Crowley, it has been argued, is a convincing revelation of the utter fallacy of the so-called drug courier profile. It also has been vigorously argued, and based upon Officer Crowley's foregoing testimony, with some degree of persuasion, that those passengers who agree to a search of their luggage are perceived by the officers as concealing nothing, and their interview is terminated, whereas passengers who object or refuse to agree to the officers' prying through their most private and personal belongings do so because they have something to hide, prompting the officers to seize and search their luggage. If nothing is found the passenger is permitted to proceed on his journey. Conversely, if drugs are discovered the passenger is arrested and charged.

It is noteworthy that the deposed Officer Crowley is the same Chicago police officer Crowley whose testimony United States Dis-

trict Court Judge James Moran rejected in *United States v. Bonds* and found the defendant not guilty, previously discussed herein.

In *United States v. Moya* (N.D. Ill. 1981), 561 F. Supp. 1, arising out of Agent Kenneth Labek and Chicago police officer Thomas Kinsella's drug courier profile interrogation and arrest of defendant Moya at the Chicago O'Hare Airport on March 20, 1980, the court pointed out:

> "Indeed, Labek himself testified that he routinely approaches two or three people a day on the basis of similar [drug courier profile] suspicions, but that these stops have led to only 70 or 80 arrests during his three years at O'Hare. Thus, as defendant has pointed out, presuming a 5-day work week and a 50-week work year, stops based on the sort of evidence that led to Moya's questioning result in arrest only 3-5% of the time." (561 F. Supp. at 4.)

However, when this same Chicago police officer Thomas Kinsella testified in *United States v. Black* (N.D. Ill. 1981), 510 F. Supp. 989, arising out of his drug courier profile interrogation and arrest of the defendant Black at the Chicago O'Hare Airport on May 14, 1980, only seven weeks after the Labek-Kinsella arrest of Moya, Officer Kinsella's arrest success ratio suddenly and unexplainably drastically increased. Kinsella testified in *Black*:

> "He has been assigned on a full-time basis to O'Hare for one year and prior to March, 1980 he had been assigned to O'Hare on a part-time basis for two years, and he had participated in approximately fifty seizures of narcotics and seventy-five investigatory stops of suspected drug couriers at O'Hare." (510 F. Supp. at 990.)

In Chicago police officers Rosemary Burzinski and Kinsella's drug courier profile interrogation and arrest of Black on May 14, 1980, the court pointed out that "[a]t the time of the defendant's arrest she [Officer Rosemary Burzinski] had been assigned to O'Hare Airport for two months," and that "Officer Burzinski had participated in approximately ten seizures and fifty stops at O'Hare prior to the defendant's arrest."

Yet, arising out of the same Officer Rosemary Burzinski's (and Agent Robert Fulkerson's) drug courier profile interrogation and arrest of the defendant Jose Cantero on April 12, 1982, at O'Hare airport, the court pointed out in *United States v. Cantero* (N.D. Ill. 1982), 551 F. Supp. 397:

> "Officer Burzinski has worked at O'Hare for two and one-half years, has participated in about 200 encounters, and has been

involved in about 50-75 seizures. \*\*\* In the last two and one-half years assigned to the airport, he [Agent Robert Fulkerson] has participated in four to five [drug courier profile] encounters per week, and in approximately 100 arrests." (551 F. Supp. at 398.)

The instant and the foregoing cases reveal no explanation, justification or reason for the gross disparity in these officers' drug courier profile interrogation failures and successes. The explanation is left solely to imaginative speculation.

Justice Schaefer aptly pointed out in *Mitchell*:

"One of the difficulties in dealing with this area of the law is that most of the cases with which the courts are concerned involve illegal possession of gambling equipment or narcotics, and the result of the search makes guilt unmistakable. The courts have no way of knowing how many unproductive searches are made upon the basis of false affidavits because those cases do not come before the courts. \*\*\*

In an atmosphere in which there is widespread concern about narcotics problems it is difficult for a court to enforce constitutional guarantees at the instance of one who is unquestionably guilty. *But the constitutional provisions are directed at potential abuses by a tyrannical government and those provisions should not, in my opinion, be so diluted in order to secure convictions in narcotics and gambling cases that they can no longer afford protection against the operations of a Hitler type government. It may be that the constitutional protection is phrased in terms that are considered too sweeping to meet the needs of society today. If so, they should be amended. But it is the responsibility of a court to interpret and apply the constitutional provisions as they exist.*" (Emphasis added.) *Mitchell*, 45 Ill. 2d at 155-56.

As I attempted to make clear in part I of this dissent, it is from small intrusions and slight deviations that the courts must be alert to offer protection. Recently, speaking of exactly these types of searches and seizures the Ninth Circuit Court of Appeals in *United States v. $124,570 United States Currency* (9th Cir. 1989), 873 F.2d 1240, 1246, cogently proclaimed:

"Liberty—the freedom from unwarranted intrusion by government—is as easily lost through insistent nibbles by government officials who seek to do their jobs too well as by those whose purpose it is to oppress; *the piranha can be as deadly as the shark.*" (Emphasis added.)

## "CAN IT HAPPEN HERE?"

The foregoing cited cases, particularly the drug cases, from across the length and breadth of our nation suggest that IT IS HAPPENING HERE. The following "cover story" from the Wednesday, November 15, 1989, edition of the nation's newspaper USA TODAY, pages 1 and 2A, by Tony Mauro, emphatically buttresses that suggestion.

### *"THE WAR ON DRUGS*
### ARE OUR RIGHTS ON THE LINE?
### SOME WORRY POLICE 'OUT OF CONTROL'

As the war on drugs intensifies, there is growing concern that the battle is claiming an unintended victim: our constitutional rights.

Emboldened by recent Supreme Court rulings, police across the USA are adopting aggressive tactics, including neighborhood sweeps, no-knock searches, reverse stings and property seizures.

'I've lived through a lot of crime crises, but we've never gone out of control like this,' says University of Michigan law professor Yale Kamisar, an expert on police searches.

\* \* \*

Until a judge stopped them, police in Socorro, N.M., walked drug-sniffing dogs past every car at an interstate checkpoint—whether they suspected drugs or not.

In Detroit, police raided a food market in a drug neighborhood, held the owner and seized his profits after dogs sniffed cocaine on three $1 bills in his cash register.

Increasingly, doubts about police tactics are being heard from unexpected quarters—judges, some of whom are conservative, and average citizens. Meanwhile, civil liberties groups and liberals in Congress—usually outspoken—have been quiet, perhaps cowed by the anti-drug mood.

'I wonder where the United States is heading,' says Denver federal judge Richard Marsch, a Nixon appointee. 'My concern is that the real victim of the war on drugs might be the constitutional rights of the American people.'

\* \* \*

Conservative economist Milton Friedman, in an open letter to Bennett [Federal drug czar], says he is 'revolted' by the prospect of 'an army of enforcers empowered to invade the liberty of citizens.'

\* \* \*

At the core of the dispute: the Fourth Amendment to the Constitution, which guarantees 'the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures.'

An increasingly conservative Supreme Court has interpreted that to allow police to poke through garbage, search by helicopter and stop citizens based on their appearance.

Says Kamisar: 'There's not much left to the Fourth Amendment, except in our homes.'

But in Hudson, N.H., some are not sure that protection from police searches remains inside the home, either.

Last summer, Hudson police, armed with a search warrant based in part on an informant's tip that was 20 months old, raided the modest apartment of Bruce Lavoie, 34, a machinist with a wife and three children.

At 5 a.m. on Aug. 3, without announcing themselves and without evidence that Lavoie might be armed, police smashed the door with a battering ram. As Lavoie rose from his bed, apparently resisting the intruders, he was fatally shot as his son watched. A single marijuana cigarette was found.

\* \* \*

Hudson town moderator Michael Keenan describes himself as a 'hard-core conservative.' But 'in the name of this so-called drug war, you can't go in and do bang-bang "Dirty Harry." ' Law and order is 'not necessarily synonymous with support for police.'

\* \* \*

Other reports from the drug war battlefield:

In Detroit, Joseph Haji still awaits the return of $4,384 authorities seized from the cash register in his Sunshine Market last December during a search that turned up no drugs.

New federal and state laws allow police to confiscate the assets of drug defendants, even before they've been found guilty of any crime. In Haji's case, he wasn't even charged.

Though the search found no drugs, police dogs 'sniffed' cocaine traces on three $1 bills—which came as no surprise to Haji, whose store is in a drug-plagued neighborhood. 'Seventy-five percent of my business is with dope dealers and users. I'm supposed to inspect the money?'

\* \* \*

Police are stepping up searches in ways that raise questions. Courts have allowed police to use 'drug courier profiles'—fac-

tors such as demeanor, dress and destination—to pick out individuals for searches.

But Miami lawyer Hirsch says that on interstates such as I-95, police are using almost any pretext to stop innocent people. 'If you look Hispanic and you're in a rented car, they'll stop you and ask if you wouldn't mind if they search the car.'

Similar searches in train stations have been struck down. Federal Judges Louis Oberdorfer and Gerhard Gesell in Washington recently tossed out two searches, finding that the only reason the defendants were stopped at Union Station was because they were black and traveling from New York. [*United States v. Winston* (D.C. Cir. 1989), 711 F. Supp. 639; *United States v. Mitchell* (D.C. Cir. 1987), 699 F. Supp. 1.]

Boston, wracked by an upsurge in drug violence, has run large-scale searches in largely black Roxbury and Dorchester, stopping, frisking and sometimes strip-searching residents they call 'known gang members' and possible associates.

'They are stopping hundreds of people just because they are young and black,' says state Sen. William Owen, who has protested the policy. 'This practice could alienate a whole generation of black men and violates the rights of all people.'

In September, Massachusetts Superior Court Judge Cortland Mathers denounced the police search policy: 'A tacit understanding exists in the Boston Police Department that constitutionally impermissible searches will not only be countenanced but applauded in the Roxbury area.'

Under court guidelines, police stopping cars for license checks can investigate for drugs only if they've developed 'a reasonable and articulable suspicion' of a crime.

But the Socorro, N.M., police didn't wait for that—they walked drug-sniffing dogs past all the cars they'd stopped.

Federal Judge John Conway, a Reagan appointee, declared the tactic unconstitutional: '*Police practices of this nature raise the grim spector of the totalitarian state.*' " (Emphasis added.) USA Today, November 15, 1989, 1A, 2A.

For the foregoing reasons, I strenuously dissent.