THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ANGEL ALCANTARA, Defendant-Appellant.

First District (3rd Division)   No. 86—3407

Opinion filed January 18, 1989.

Robert C. Lucenti, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kathleen A. Bom, and Rosemary Grant Higgins, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

In a bench trial, defendant, Angel Alcantara, was convicted and sentenced to six years for possession of a controlled substance with the intent to deliver. On appeal, he contends that the trial court erred in denying his motion to suppress and that he was wrongfully sentenced for a Class X felony. We affirm the conviction and remand for resentencing of defendant for a Class 3 felony.

Defendant and Drug Enforcement Administration (DEA) agent Larry Johnson testified at the suppression hearing. According to Johnson, he was assigned to the O'Hare Airport detail on April 20, 1985. While he was assigned to the O'Hare detail, Johnson conducted about 50 to 60 drug investigations. On the morning of April 20, he received a phone call from narcotics agent Robert Duvall of the Public Safety Department in Austin, Texas. Duvall told Johnson that an individual named Angel Alcantara was traveling that morning from San Antonio, Texas, through Houston, Texas, to Chicago O'Hare Airport on Continental flight 154. Duvall described Alcantara as a 30- to 35-year-old male with a mustache and a two-day-old beard. Duvall said that Alcantara was carrying a controlled substance to deliver to two individuals in Chicago and that Alcantara was not a licensed pharmacist.

Based on the information he received from Duvall, Johnson contacted the Chicago police department to assist in setting up a surveillance of passengers departing flight 154. Johnson then went to O'Hare Airport, where he was met by three Chicago police officers at the passenger gate for flight 154. A surveillance was arranged.

Defendant was one of the first passengers to leave the plane. Johnson observed that defendant fit the description that had been provided by Duvall. He also saw that defendant was carrying a carry-on bag. When defendant did not go down the escalator to the baggage area, Johnson and two of the Chicago police officers, both dressed in plain clothes, approached defendant. Johnson identified himself as a Federal agent and the police officers identified themselves as police officers. Johnson asked defendant if he could see his airline ticket and identification. Defendant produced his ticket and his Texas driver's license. After Johnson examined the items and returned them, he concluded that defendant was the person who had been described by Duvall. Johnson told defendant that he was conducting a drug investigation and would like to ask him some questions.

At Johnson's request, defendant agreed to accompany Johnson and the police officers to a large office behind the Continental Airlines ticket counter, approximately 20 feet from where they had been standing. According to Johnson, neither he nor the police officers touched defendant or displayed their guns to obtain defendant's cooperation. Johnson testified that he suggested the nearby office because the concourse was crowded and visible from the street, and that the individuals who were expected to purchase the controlled substance from the defendant would be able to observe what was going on in the concourse from a parked automobile. Johnson believed that the

use of the office was necessary for a quiet and effective inquiry and to insure the safety of defendant and the people in the concourse.

After Johnson, defendant and two of the police officers went into the office, Johnson asked defendant if he was carrying illegal drugs. Defendant denied that he was carrying illegal drugs. Johnson then asked defendant if he could search his carry-on bag. Johnson also told defendant that he could refuse the search request. Defendant agreed to allow the search of the carry-on bag. Johnson searched the carry-on bag and found 10 bottles of glutethimide, a controlled substance. Each bottle had 1,000 glutethimide tablets. After the glutethimide tablets were discovered, Johnson called the DEA office to confirm that glutethimide was a controlled substance. Defendant was then placed under arrest and read the *Miranda* warnings.

Johnson testified that the encounter and search lasted about 10 minutes. Also, he testified that the large office in which the search was conducted was adjacent to two smaller offices and that several unknown employees who worked in the area passed through the offices while the investigation was being conducted.

Defendant's version of what occurred is different than Johnson's version. According to defendant, he was grabbed by two police officers as he was attempting to leave the terminal. He was then taken to a nearby room behind the airline ticket counter. One of the police officers swore at defendant and told him to get against the wall. Defendant was never asked to produce identification. Defendant's plane ticket and wallet were taken from his jacket pocket. After his plane ticket and driver's license were taken from him, one of the police officers proceeded to forcibly open his carry-on bag. Instead of opening the zipper from the bottom, the police officer tried to snap it open on the top because he thought the opening for the bag was a Velcro fastening. The bag was torn. Defendant lunged over and said, "Wait a minute." Before defendant could say anything else, the police officer told him to shut up and stand by the wall. Defendant did not think that he was free to leave. None of the police officers displayed an arrest or search warrant during the encounter. Defendant also testified that he never consented to the search of his carry-on bag and that he was never told that he could refuse the search. In addition, defendant testified that although no gun was ever drawn by the police officers, when one of the police officers bent down defendant saw that he had a gun fastened to his ankle.

After hearing the two versions of what occurred at the airport, the trial court denied defendant's motion to suppress on the basis that there was no seizure and defendant consented to the search of his

carry-on bag. We believe that the trial court, as the finder of fact, had a right to reach its conclusions and deny the motion to suppress.

We first observe that police do not seize a person within the meaning of the fourth amendment by merely approaching him in a public place and asking him questions. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.) However, physically grabbing, moving or seating a person to ask questions, even in a public setting, restrains that person's movement and liberty in such a way that such police conduct would amount to a seizure as meant by the fourth amendment. (See *United States v. Sokolow* (9th Cir. 1987), 831 F.2d 1413, 1417, *cert. granted* (1988), 486 U.S. 1042, 100 L. Ed. 2d 618, 108 S. Ct. 2033.) Also a person's liberty is affected and a seizure occurs if police accost him to ask questions and restrain his freedom to walk away. (*Terry v. Ohio* (1968), 392 U.S. 1, 16, 20 L. Ed. 2d 889, 903, 88 S. Ct. 1868, 1877.) The person approached need not answer any questions, and he may even decline to listen to the questions and go on his way. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.) Any curtailment of a person's liberty to walk away must be supported by at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity. *Reid v. Georgia* (1980), 448 U.S. 438, 440, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754.

Here, the trial court had a right to believe the testimony of Johnson that when the defendant was approached and asked questions in a public setting, there was no physical grabbing, moving or seating of the defendant. Also, the trial court had the right to believe that defendant produced his driver's license and plane ticket voluntarily and that the documents were returned to him after a brief examination. (See *United States v. Schumacker* (N.D. Ill. 1983), 577 F. Supp. 590.) In addition, it was within the purview of the trial court's fact-finding authority to conclude that defendant's liberty was not affected and that he was not restrained from walking away. Moreover, based on all the circumstances that were revealed by the evidence at the preliminary hearing, the trial court had the authority to reach the conclusion that defendant consented without threat of force or restraint to have his carry-on bag searched. Thus, we see no reason to reverse the trial court's ruling on the motion to suppress.

Next, we address defendant's contention that he should not have been sentenced for a Class X felony. Defendant was found guilty of possession with intent to deliver a controlled substance known as glutethimide. At the present time, glutethimide is listed by the legislature as a schedule II controlled substance. (Ill. Rev. Stat. 1987, ch.

56½, par. 1206(e)(6).) Possession with intent to deliver a schedule II controlled substance is a Class X felony. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(11).) Defendant argues that at the time of the occurrence and arrest glutethimide was a schedule III controlled substance. Possession with intent to deliver a schedule III controlled substance is a Class 3 felony.

Defendant was arrested on April 20, 1985. At that time glutethimide was listed by the legislature as a schedule III controlled substance. (Ill. Rev. Stat. 1983, ch. 56½, par. 1208(d)(5).) However, prior to April 20, 1985, the Dangerous Drug Commission (Commission), which is now known as the Illinois Department of Alcoholism and Substance Abuse, had changed glutethimide in its schedule of controlled substances from a schedule III to a schedule II controlled substance. As a result, on June 29, 1985, the Illinois legislature passed Public Act 84—874, changing glutethimide to a schedule II controlled substance. The new law was given an effective date of January 1, 1986.

The State argues that because the Commission had changed glutethimide from a schedule III to a schedule II controlled substance prior to the commission of the crime, the defendant was properly sentenced for a crime involving a schedule II controlled substance. We disagree. We believe that the law as defined by the legislature at the time of the commission of the crime is the law that must be applied. Thus, defendant should have been sentenced for the commission of a crime involving a schedule III controlled substance rather than a schedule II controlled substance.

Accordingly, the conviction is affirmed and the case is remanded for resentencing of defendant for the commission of a Class 3 felony.

Affirmed in part; vacated and remanded with directions.

McNAMARA and WHITE, JJ., concur.