THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
WILLIAM MURRAY, Defendant-Appellee.

First District (1st Division)    No. 1—87—2572

Opinion filed September 5, 1989.

QUINLAN, J., dissenting.

Milton Blum, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Kenneth T. McCurry and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

Defendant, William Murray, was charged by information with unlawful use of a weapon by a felon. (Ill. Rev. Stat. 1987, ch. 38, par. 24—1.1.) He filed a motion to quash his arrest and to suppress evidence which was denied after an evidentiary hearing. Following a

bench trial, he was convicted as charged and sentenced to a term of two years' probation with 15 weekends of incarceration at the Cook County Department of Corrections. On appeal, he contends that the trial court erroneously denied his motion to quash arrest and to suppress evidence and that the evidence was insufficient to establish his guilt beyond a reasonable doubt.

During the evidentiary hearing on the motion, defendant testified that at 10 a.m. on October 4, 1986, he was sitting in the driver's seat of his automobile, which was parked northbound on the frontage road adjacent to the Calumet Expressway near 104th and Doty Road in Chicago. Defendant, who was en route to his son's funeral, had stopped to regain his composure. He then observed a police car proceed southbound on the expressway, exit, emerge onto the road and park behind the vehicle defendant occupied. Officers James Flaherty and Charles Brown then walked from their squad car to defendant's legally parked vehicle and told him to step from his car. Defendant exited his vehicle, closed the door and upon request surrendered his license. Neither officer showed defendant a warrant. While one officer examined defendant's license, the other one opened the car door and stated "Can you stand a search[?]" to which defendant replied "[y]es." Defendant told him that he could not search his car. The officer stated, "Oh yes—want to bet?" The officer then searched the vehicle and claimed that he had found a gun on the floor in front of the driver's seat. Defendant further testified that he had not seen a weapon in the car, nor was he aware that one was there.

Officer Charles Brown testified that at 11:30 a.m. on October 4, 1986, he and his partner, Officer James Flaherty, became concerned when they observed defendant asleep behind the steering wheel of a Ford automobile parked near the roadside. They approached defendant's vehicle and knocked on the window to awaken him. When he awakened they asked him for his license. He then exited his car and tendered his license to Officer Flaherty. Officer Brown, who was standing to the side of the door and at the front of the windshield, looked into the car after defendant alighted, observed a handgun on the floor, and alerted his partner. Officer Brown then arrested defendant while Officer Flaherty seized the loaded weapon.

During the trial Officer Brown added that defendant appeared to be asleep but in "some distress" when the police first observed him. He also stated that only Officer Flaherty knocked on the window to awaken defendant, and that the policemen also asked defendant to exit the vehicle and to produce his identification. Officer Brown further testified that from his position "at the front of the [defendant's]

car," he observed the weapon "on the floor in the front seat, the driver's seat, approximately six inches from the driver's seat." Officer Brown immediately informed his partner of the weapon. The policemen seized the gun, arrested defendant and transported him to the station.

Jerome McDonald and Lucille Green testified for defendant. At the commencement of McDonald's testimony a stipulation was entered that he was the owner of the handgun recovered from the vehicle in which defendant was arrested. McDonald added that shortly before the trial he learned that the weapon had been taken from his former residence.

Green testified that she was defendant's mother and the owner of the vehicle from which the weapon was recovered. Green added that she, defendant and his son were the only persons who drove her car. She added that on September 29, 1986, defendant's son died from gunshot wounds and that his funeral had been scheduled for October 4, 1986. Prior to his death he had been "in trouble" with the law.

Defendant testified that on October 4, 1986, he was driving to his son's funeral when he parked northbound on the road adjacent to the Calumet Expressway near 104th and Doty Road to regain his composure. He then sat in a semi-reclining position and observed a squad car proceed southbound on the expressway, exit, enter onto the road and park behind his vehicle. When the policemen emerged from their vehicle, Officer Brown walked to the passenger side, and Officer Flaherty approached the driver's side of defendant's car. They ordered him to step from his car. He complied and closed the door.

While Officer Flaherty examined defendant's driver's license, Officer Brown pushed defendant aside, opened the door, "got down on one knee, pulled a floor mat out of the car," and stated, "See what I found." He then "showed something" to Officer Flaherty. The policemen transported defendant to the station, where they showed him a handgun and informed him that it had been found in his car. Defendant further testified that he did not use nor had he discussed the use of controlled substances with the police officers. Defendant also stated that he had not used the automobile for "sometime" before his arrest.

Officer James Flaherty testified that he was proceeding northbound when he observed defendant "slumped over" the steering wheel of a parked car near 104th and Doty Road. Officers Flaherty and Brown then stopped to determine defendant's condition. They awakened him by knocking on the window, and then Officer Flaherty asked for his driver's license. Flaherty could not remember if defendant had been asked to exit his car. Nevertheless, after defendant

stepped from his car, Officer Brown observed the handgun on the floor. Officer Flaherty did not see the weapon until his partner removed it from defendant's vehicle. The officers arrested defendant and drove his car to the station where they searched it. According to Officer Flaherty, although defendant had no controlled substances in his possession, defendant volunteered that his use of heroin caused him to park on the roadside. The policeman also stated that he could not recall if he had inventoried a prescription but believed that defendant had used "something" supplied by a physician.

■ Defendant argues that his guilt was not established beyond a reasonable doubt because the trial court placed too much reliance on the police officers' testimony. Where the defendant's testimony conflicts with that of the officers', the question of credibility is best resolved by the trial court. *People v. Underwood* (1982), 108 Ill. App. 3d 846, 850, 439 N.E.2d 1080.

While we agree with the State that the testimony elicited at the trial, with the introduction of physical evidence seized from the floor of the vehicle in which defendant was the only occupant, sufficiently proved defendant's guilt beyond a reasonable doubt, we reverse on the basis of defendant's second assertion regarding that physical evidence.

■ Defendant's second assertion is that the trial court erroneously denied his motion to quash the arrest and suppress evidence. The decision of the trial court on a motion to suppress will be reversed only when it is against the manifest weight of the evidence. (*People v. Watson* (1986), 145 Ill. App. 3d 492, 495 N.E.2d 1153.) It is well settled that police officers may approach an individual for purposes of investigating possible criminal behavior where there is no probable cause to arrest, provided, however, that the officers' decision to stop is based on specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant the investigative intrusion. (*People v. Lilly* (1976), 38 Ill. App. 3d 379, 382, 347 N.E.2d 842; *People v. Fox* (1981), 97 Ill. App. 3d 58, 62, 421 N.E.2d 1082.) Additionally, section 6—112 of the Illinois Vehicle Code requires a motorist to produce his license or permit to officers pursuant to investigations related to compliance with the licensing statute. (Ill. Rev. Stat. 1987, ch. 95½, par. 6—112.) Notwithstanding, law enforcement officials may not use their authority under the statute as a pretext to investigate matters unrelated to licensing requirements. *People v. Harr* (1968), 93 Ill. App. 2d 146, 150, 235 N.E.2d 1.

■ When the police officers herein approached defendant, they did not have a reasonable suspicion that he was committing a crime

and were not investigating his compliance with licensing requirements. According to the State, the encounter was initiated to render assistance to defendant, whom the officers believed to be asleep and in distress. The officer testified that they first knocked on the window to awaken defendant. When he awakened, apparently immediately, the officers did not inquire as to defendant's well-being but ordered him to produce his license and to exit his car. We believe that demand was inconsistent with the purported intent to render assistance to one whom they had perceived to be in distress.

To support its contention that it was reasonable and proper under the fourth amendment for the officers to order defendant to exit his car and produce his driver's license, the State relies upon *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330, *Cady v. Dombrowski* (1973), 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523, *People v. Ledwa* (1980), 81 Ill. App. 3d 276, 401 N.E.2d 298, and *People v. Smith* (1970), 47 Ill. 2d 161, 265 N.E.2d 139. We believe that the State's reliance is misplaced. *Pennsylvania v. Mimms* involved a routine patrol stop of a motorist who had committed a traffic violation. The officers demanded his license for the purpose of issuing a traffic citation. And as a matter of standard precautionary procedure, the motorist was asked to step from the car. *Cady v. Dombrowski* involved a drunken motorist who had summoned police for help after he had been involved in an automobile collision. The officers performed the "community caretaking" act of removing the motorist's disabled and illegally parked vehicle from the road. In *People v. Ledwa* the policeman concomitantly observed defendants sleeping in a car and drug paraphernalia on a stack of clothing in the rear seat. The officers removed defendants from the car upon a reasonable suspicion that there was criminal activity. In *People v. Smith* police found the unconscious defendant lying on a hallway floor. Upon awakening he was incoherent. A search was conducted to determine his identity.

In the case before us, the officers approached defendant without any suspicion that criminal activity was afoot. According to the State's evidence, the policemen intended to render assistance to defendant. Their initial contact was the knock on the car window to which defendant aptly responded, placing them on notice that there was no need for emergency assistance as in *People v. Smith*. Through escalating that intrusion by demanding defendant's driver's license and ordering him to exit his car, the officers violated defendant's fourth amendment rights.

■ Our learned colleague in dissent relies upon *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870,

and *People v. Hicks* (1989), 183 Ill. App. 3d 636, 539 N.E.2d 756, for the proposition that where there is a consensual encounter, no seizure of the person occurs, and hence, no violation of constitutional dimensions takes place. We do not quarrel with that proposition. We do, however, find the instant case to be distinguishable from the factual matrix presented in those two cases. A police officer speaking to a person walking in an area or down the street is far different from a show of authority by police demonstrated by a demand that one produce a driver's license and a command that one exit a vehicle. It is our view that defendant was indeed "seized" at the time he was ordered to produce a driver's license and exit the vehicle by virtue of the show of authority exhibited by the police officers. At that moment defendant's freedom of movement was restrained. Unlike the *United States v. Mendenhall* and *People v. Hicks* defendants, the inference here is clear that defendant was not free to disregard the questions and commands and walk away. *United States v. Mendenhall* and *People v. Hicks* are completely inapposite.

We hold that the denial of defendant's motion to quash the arrest and suppress the evidence was manifestly erroneous.

For the reasons stated, the judgment of the circuit court of Cook County is reversed.

Judgment reversed.

O'CONNOR, J., concurs.

JUSTICE QUINLAN, dissenting:

I respectfully dissent from the majority's finding today that the defendant's fourth amendment rights were violated by the action of the police officers in the present case in requesting to see a motorist's driver's license and in asking him to step from his vehicle where he had been slumped over in a parked car, next to a busy expressway, in the early morning hours. I disagree with this finding for two essential reasons: (1) there was no "stop" of the motorist here which would require a justification for the officers' action and (2) there never was a seizure of the motorist until one of the officers observed a gun on the floor of the auto, which was in plain view when the defendant exited the auto. For the majority to hold, contrary to the trial court's finding on the motion to suppress, that the officers' conduct violated the defendant's fourth amendment rights to be free from illegal searches and seizure, sends a most confusing message to police officers in general and improperly taints the conduct of the two police officers in the

present case, who acted in a very sound and responsible manner.

I believe that this case is very similar to the recent case decided by this court in *People v. Hicks* (1989), 183 Ill. App. 3d 636, 539 N.E.2d 756, which was concurred in by the two judges in the majority today. In *Hicks*, we found the activities of the officers there to be merely a consensual interaction with the defendant and not a stop requiring specific articulable facts of reasonable suspicion of criminal activity as set forth in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.[1] In *Hicks*, the officers observed the defendant exit from an airplane at O'Hare Airport and followed him for a short distance before one officer spoke to the defendant, while the other officer stood nearby and observed the conversation. (*Hicks*, 183 Ill. App. 3d 636, 539 N.E.2d 756.) The officer who spoke to the defendant identified himself as a police officer, then asked the defendant for some identification and a copy of his airline ticket. (*Hicks*, 183 Ill. App. 3d at 639, 539 N.E.2d at 758.) This same panel of judges sitting today found that that activity of the officers there did not require a finding of reasonable suspicion since they agreed that there was no stop, and, thus, no seizure of the defendant. Accordingly, we held in *Hicks* that the encounter was consensual and did not require any additional constitutional justification. (*Hicks*, 183 Ill. App. 3d at 644, 539 N.E.2d at 761.) In that case, we relied upon the reasoning of the United States Supreme Court in *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, which has also been adopted in Illinois as the test for when a seizure of a person takes place. (See *People v. Forrest* (1988), 172 Ill. App. 3d 385, 526 N.E.2d 616.) In *Mendenhall*, the Supreme Court noted:

> " 'There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets,' [citation]. Police officers enjoy 'the liberty (again, possessed by every citizen) to address questions to other persons [citation] *** '
>
> ***
>
> We adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safe-

---

[1]Of course, if the activity did not need to be justified by specific articulable facts of criminal activity under *Terry*, it also did not need to be justified by facts warranting a finding of probable cause to arrest. Therefore, I do not consider this issue in my dissent other than collaterally and where appropriate.

guards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' [Citation.] As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.

\* \* \*

[The] \*\*\* conclusion that no seizure occurred is not affected by the fact that the respondent was not expressly told by the agents that [he or] she was free to decline to cooperate with their inquiry, for the voluntariness of [the] responses does not depend upon [his or] her having been so informed. [Citation.] We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to [his or] her self-interest is that [he or] she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that [they] later regret[ ], but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily." *Mendenhall*, 446 U.S. at 553-56, 64 L. Ed. 2d at 508-10, 100 S. Ct. at 1876-78.

Further, as the *Mendenhall* court also noted, whether a defendant's consent to the encounter and interaction is voluntary or was the product of duress or coercion, expressed or implied, is to be determined by the totality of all the circumstances. (*Mendenhall*, 446 U.S. at 557, 64 L. Ed. 2d at 511, 100 S. Ct. at 1879.) Here, the trial court found that the police officers had acted reasonably and did not violate the defendant's right to be free from unlawful searches and seizures. As the majority notes, the decision of the trial court on a motion to suppress will be reversed only when it is against the manifest weight of the evidence. (See *People v. Watson* (1986), 145 Ill. App. 3d 492, 495 N.E.2d 1153.) The finding of the trial court here clearly was not against the manifest weight of the evidence.

In the present case, Officers Flaherty and Brown observed the

defendant, who appeared to be asleep, slumped over behind the steering wheel of an automobile parked on the frontage road adjacent to the Calumet Expressway near 104th and Doty Road at 10 a.m. The officers proceeded to investigate the situation. Officer Flaherty approached defendant's vehicle and knocked on the window, awaking the defendant. Officer Flaherty asked the defendant for his driver's license and either asked him to exit the car or the defendant, himself, voluntarily stepped out of the auto. Officer Brown was standing to the side of the door and at the front of the windshield at this time. As the defendant exited the auto, Officer Brown looked into the car and observed a handgun on the floor of the car and alerted his partner. Officer Brown then arrested the defendant and Officer Flaherty seized the weapon.

As this same panel said in *Hicks*, in what I believe to be a very similar type of situation, "under the *Mendenhall* test, there was no seizure." (*Hicks*, 183 Ill. App. 3d at 643, 539 N.E.2d at 761.) Consequently, since there was no seizure of the defendant there, but only a consensual encounter, there was, of course, no need to justify the officers' activity on the grounds of reasonable suspicion, as any inquiry of reasonable suspicion was rendered irrelevant by the consensual nature of the encounter. Similarly here, the initial encounter between Officers Flaherty and Brown and the defendant was merely a consensual type of encounter until Officer Brown saw the handgun in the defendant's automobile. Thus, the actions of the police officers here also did not violate the defendant's constitutional rights.[2] Contrary to the majority's view, I also find the present case to be factually similar to *People v. Ledwa* (1980), 81 Ill. App. 3d 276, 401 N.E.2d 298. There the police officers found two young men asleep in an automobile parked along a roadside in a park, and, while investigating, the officers found LSD and marijuana paraphernalia in the car. (*Ledwa*, 81 Ill. App. 3d at 277, 401 N.E.2d at 300.) The court ruled that the offi-

---

[2]The majority distinguishes the *United States v. Mendenhall* and *People v. Hicks* cases by finding the situation here different from those cases because, as the majority states, the police engaged in a show of authority when they "demanded" that the motorist produce his driver's license and "commanded" him to exit his vehicle. The majority asserts that the defendant was seized at that point, and that his freedom of movement was restrained. However, the only factual difference between the actions of the officers here and the officers in *Mendenhall* and *Hicks* is that at the time of the encounter the officers here were in uniform and they asked to see the defendant's license (there is no evidence that the officers "demanded" the motorist's license) and they requested that he exit his vehicle (again, there is no evidence that the police officers "commanded" him to exit his vehicle and, in fact, there is some evidence that the defendant voluntarily exited his vehicle). However, I have difficulty in seeing any

cers there had acted properly in conducting an investigation and that the evidence obtained was properly admissible at the subsequent trial. The court stated:

"Defendants argue that the cannabis found in the trunk [discovered as a consequence of the drug paraphernalia in plain view] is inadmissible * * *. We cannot agree. The police officers did not first approach the automobile as law enforcement officers; they approached as public safety officers. They investigated two young men slumped down in an automobile parked along the roadside. The officers had a duty to investigate to determine whether the young men were injured or ill. They then discovered contraband in plain view. We fail to see any difference between this and a traffic stop." *Ledwa*, 81 Ill. App. 3d at 278-79, 401 N.E.2d at 301.

Additionally, because I do not believe that the officers unlawfully stopped or seized the defendant here, the arrest of the defendant for possession of the weapon and the subsequent charging of the defendant with unlawful use of a weapon by a felon was also proper. Moreover, the evidence introduced at the trial of the defendant, which included the officers' testimony and the evidence of the constructive possession of the gun on the floor of the automobile, six inches from the driver's seat, established, I believe, the defendant's guilt beyond a reasonable doubt.

Accordingly, I would affirm the judgment of the circuit court of Cook County.

---

legal significance in these differences, since the officers in *Mendenhall* and *Hicks* identified themselves as police officers, asked the defendant for identification, and ultimately requested him to follow them to a more remote area to search his luggage. How the actions in those cases merely constituted a consensual encounter, while in the present case the actions resulted in a constitutionally prohibited seizure and restraint of the defendant's freedom of movement eludes me. The actions of the officers here and in those cases seems to me to be very similar and without any legal difference.

Also, the specific legal holding of the majority that a request for a motorist to produce a driver's license and that the driver exit his vehicle constitutes, *ipso facto*, a seizure within the meaning of the law, resulting in a restraint of freedom, is a new and novel rule of law. To my knowledge, no court has so held and those courts which have considered similar issues have in fact found to the contrary.