THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR M. SALOME, Defendant-Appellant.

Fourth District No. 4—90—0189

Opinion filed August 30, 1990.

Rex L. Reu, of Thomson & Weintraub, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:
Defendant appeals his conviction of possession of less than 15 grams of a substance containing cocaine. (Ill. Rev. Stat. 1987, ch.

56½, par. 1402(b).) He argues the trial court's denial of his motion to suppress evidence was contrary to the manifest weight of the evidence. Defendant contends the officer who questioned him did not have a reasonable suspicion supported by articulable facts that he was engaged in criminal activity pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. Therefore, defendant contends his consent to search the vehicle in which he was a passenger and the owner's consent were invalid.

We affirm.

The facts are compiled from the hearing on the suppression motion and trial testimony. On February 12, 1989, at approximately 7:55 a.m., Illinois State Trooper Michael Snyders purchased gasoline at Pool's Amoco station in Chenoa. As Snyders was leaving, he observed a yellow 1977 Chevrolet pickup truck parked at the northwest corner of the station. The station is located near the intersection of Route 24 and Interstate 55. The truck was facing northbound. Two men were working on it, and the hood was up. Both men made eye contact with Snyders as he drove past them. Snyders ran a registration check on the license-plate number as he drove on to the interstate. After a two- to three-minute delay, he received a message indicating the registration belonged to a Honda.

Snyders returned to the station, where he discovered he had made an error in the license number. He reran the number, which came back as a 1977 Chevrolet truck. Snyders drove close to the truck to record the license-plate number and observed that the hood was down. Both individuals were standing near the left front headlight of the truck. Neither made eye contact with Snyders. As he drove past, Snyders looked in his rearview mirror. He saw the defendant walk briskly back to the passenger side of the vehicle, reach inside, do something with his hands, then look at the police car. Snyders turned around, radioed he was going to check a suspicious vehicle, and parked his vehicle. The gasoline station's parking lot and the Hen House Restaurant's parking lot are adjacent to each other. Snyders stated he was 30 feet away from the truck, between it and the restaurant. He was not between the truck and Route 24.

Snyders further testified he was suspicious because there were very few people around, defendant appeared nervous, appeared to have hidden something in the passenger area of the truck, and the truck was parked in a suspicious manner. At trial, Snyders stated an armed robbery had occurred at a gasoline station near the Amoco station less than a month before.

Snyders walked up to defendant and Luis Aguilar. He asked the

two what they were doing and for some identification. Snyders talked to the men in a friendly manner. Aguilar stated the thermostat in his truck went out and they were replacing it. Aguilar gave Snyders an identification card and the vehicle's title. However, he did not have a driver's license. Defendant gave Snyders his driver's license. Aguilar stated the truck belonged to him.

Snyders testified he took the identification back to his patrol car and ran a license check. Everything came back valid. Snyders then returned to the truck and returned the documents to their owners. Snyders asked defendant if he had hidden anything in the truck. Snyders told defendant about his suspicions. However, defendant stated he had nothing to hide. Snyders also told the two men about the armed robbery. Snyders then asked defendant and Aguilar for permission to search the vehicle for guns or drugs. He also requested consent to search the glove compartment. Both consented. Snyders stated he told the men they did not have to consent to the search and asked whether they spoke English. Snyders admitted he did not ask whether he could open containers which he found in the glove compartment. He asked defendant and Aguilar to stand where he could see them as he searched.

In the glove compartment, Snyders saw two winter gloves and an empty ammunition clip. As he pulled the clip out of the glove compartment, he noticed one of the gloves was heavy. When he moved it, he saw the butt of a handgun. After Snyders found the weapon, he frisked defendant and Aguilar. He then radioed for backup. A further search revealed five rounds of live ammunition in defendant's pockets and cocaine in a pill box located in defendant's other glove. Defendant stated the weapon and drugs were his.

Ronald Van Houten, an attendant at Pool's Amoco, stated Snyders asked him how long the yellow truck had been in the lot as Snyders was purchasing fuel. Van Houten told Snyders the truck had been there 10 to 15 minutes for repairs. Then, Van Houten observed Snyders leave. Soon after, he saw Snyders pull up behind the truck. Snyders was parked 10 feet behind the truck between it and Route 24. Van Houten stated defendant and Aguilar arrived shortly before 8 a.m. They parked at the west side of the station. Aguilar asked Van Houten to change the thermostat of the truck. Since Van Houten could not do so, Aguilar bought a thermostat and borrowed tools. Van Houten's view of defendant and Aguilar was obstructed by pop machines, chips, and candy racks.

Aguilar testified he pulled into the Amoco station to fix the thermostat. Defendant was his passenger. He saw Snyders purchase gaso-

line. Snyders then left the lot but returned and parked about a car length behind Aguilar's truck. The patrol car was between the truck and Route 24. The hood was up on the truck when Snyders approached. Snyders asked if Aguilar and defendant had car trouble. He talked to Aguilar and defendant as they replaced the thermostat. After Aguilar and defendant finished the repair and lowered the hood, Snyders asked for identification. Snyders was standing in front of the truck at the time. Aguilar gave Snyders a checkbook with his driver's license number, his United States residency permit, and the title to the truck. Defendant gave Snyders a driver's license. Snyders returned to the police car to check the identification. After five minutes he returned and told Aguilar and defendant that everything was correct.

Aguilar further testified Snyders did not return the documents. Snyders asked permission to search the truck but did not tell them his reason. Aguilar gave Snyders consent to search. Snyders did not tell Aguilar or defendant that they could refuse consent nor did he ask for consent to search containers within the glove compartment. He returned the documents only after defendant had been arrested.

Defendant testified at the suppression hearing. His testimony essentially corroborated Aguilar's testimony. Defendant stated it was very cold on February 12, 1989. He went to the passenger compartment of the truck on several occasions to retrieve tools and rags. Snyders parked 10 feet behind the truck and talked to defendant and Aguilar as they worked. They were ready to leave when Snyders asked for identification. After Snyders checked their identification, he told them everything was okay. Defendant volunteered to drive because Aguilar did not have a license with him. While still holding the documents, Snyders asked permission to search the vehicle.

Initially, the trial court granted the defendant's motion to suppress the weapon, ammunition, ammunition clip, cocaine, and defendant's statement. The court ruled Snyders observed insufficient factors to form a reasonable suspicion of criminal activity. Therefore, his seizure of defendant was improper and any subsequent consent ineffective. In ruling upon the People's motion for reconsideration, the court denied defendant's motion to suppress, finding no stop and seizure of defendant occurred prior to the consent. After a bench trial, the court found defendant guilty and sentenced him to 30 months' probation, a fine, and costs.

Defendant maintains he was seized for fourth amendment purposes when Snyders ordered him to produce his identification and restrained his freedom of movement. Defendant noted Snyders was sus-

picious of him, wore a weapon, blocked defendant's access to Route 24, and did not return defendant's license or Aguilar's identification until after an arrest had been made. Since Snyders did not have a reasonable suspicion supported by facts that Aguilar and defendant were involved in criminal activity, the seizure violated the fourth amendment. Defendant relies upon *People v. Murray* (1989), 188 Ill. App. 3d 488, 544 N.E.2d 1008, in which the appellate court reversed the trial court's denial of a motion to suppress.

■ However, the Illinois Supreme Court recently reversed the appellate court decision and discussed factors to be considered in determining when a "seizure" occurs for fourth amendment purposes. The supreme court noted that not all contact between the police and members of the public constitutes a seizure. In *People v. Murray* (1990), 137 Ill. 2d 382, the supreme court noted that Murray was asleep or resting in his legally parked car. Two police officers became concerned about his condition and approached him. The police officers parked their squad car behind defendant's vehicle. The officers stated defendant appeared to be in distress. Although the evidence was conflicting, the officers testified that after defendant awoke they told him to exit the vehicle and asked for identification. After defendant opened the door, one of the officers saw a weapon. At Murray's suppression hearing, he testified an officer searched his vehicle after he expressly refused permission to do so. The supreme court rejected the argument that defendant was seized when police officers ordered him out of the vehicle and asked for identification.

The *Murray* court stated:

"There are, theoretically, three tiers of police-citizen encounters. [Citation.] One tier involves an arrest of a citizen, which action must be supported by probable cause; otherwise, the fourth amendment prohibition against unreasonable seizures is violated. [Citation.] The next tier involves a so-called *'Terry'* stop, a brief seizure that must be supported by a reasonable suspicion of criminal activity to be within acceptable fourth amendment boundaries. [Citation.] The last tier involves no coercion or detention and therefore does not involve a seizure. This tier is commonly known as the community caretaking function or public safety function. The Supreme Court elaborated on this level of police intrusion in *Terry* when it noted that '[o]bviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude

that a "seizure" has occurred.' *Terry v. Ohio* (1968), 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16 ***." *Murray*, 137 Ill. 2d at 387-88.

■ The *Murray* court noted that in *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870, the United States Supreme Court set forth the parameters of activity which may constitute a seizure. In *Mendenhall*, the Court adopted a view that a person is seized only when his freedom of movement is restrained by physical force or a show of authority. However, as long as the person remains free to disregard questions and leave there is no intrusion on the person's liberty requiring objective justification. The test for determining when police have seized an individual is whether, in view of all the circumstances of the incident, a reasonable person would have believed he was not free to leave. *Mendenhall*, 446 U.S. at 554-55, 64 L. Ed. 2d at 509-10, 100 S. Ct at 1877-78; see also *People v. Graves* (1990), 196 Ill. App. 3d 273, 553 N.E.2d 810.

In *Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319, a majority of the United States Supreme Court endorsed the *Mendenhall* standard. In *Murray*, the Illinois Supreme Court stated the *Mendenhall* standard was helpful and appropriate. (*Murray*, 137 Ill. 2d at 388.) The court then reviewed the facts in *Murray* and found Murray was not seized prior to the officers observing the weapon.

■ ■ The *Mendenhall* Court and *Murray* court noted four factors which may indicate a seizure occurred. They are (1) the threatening presence of several officers, (2) display of a weapon by an officer, (3) some physical touching of the person of a citizen, and (4) use of language or tone of voice indicating compliance is required. (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877; *Murray*, 137 Ill. 2d at 388.) A trial court's ruling on a motion to suppress will only be reversed when it is contrary to the manifest weight of the evidence. (*Murray*, 137 Ill. 2d at 387; *People v. Christensen* (1990), 198 Ill. App. 3d 168, 555 N.E.2d 746.) The trial court is free to reject defendant's version of the events. *People v. Alcantara* (1989), 179 Ill. App. 3d 105, 534 N.E.2d 405.

■ In the instant case, if Snyders' testimony is believed, he parked 30 feet behind the truck, did not display a weapon, and returned identification to defendant and Aguilar prior to asking consent to search. Snyders told the men they were free to refuse consent to the search. Additionally, Snyders stated he conversed with the men in a friendly fashion. Though he was suspicious, he also wanted to know if they needed assistance. Defendant's testimony also supports a find-

ing that no seizure occurred prior to the consent to search. Defendant stated that after Snyders returned to the truck and had run an informational check on defendant's license, defendant volunteered to drive the rest of the trip. This indicates defendant felt he was free to leave. The trial court's determination that no impermissible stop and seizure occurred is supported by the manifest weight of the evidence.

For the above reasons, we affirm the trial court.

Affirmed.

KNECHT, P.J., and SPITZ, J., concur.